1  NIALL P. McCARTHY (SBN 160175)
   nmccarthy@cpmlegal.com
2  JUSTIN T. BERGER (SBN 250346)
   jberger@cpmlegal.com
3  ADAM M. SHAPIRO (SBN 267429)
   ashapiro@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
   San Francisco Airport Office Center
5  840 Malcolm Road
   Burlingame, CA 94010
6  Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
7
8  *Attorneys for Relator*

**FILED**

MAR 02 2018

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9  **IN UNITED STATES DISTRICT COURT**

10 **FOR NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **[UNDER SEAL]; and STATE OF CALIFORNIA** *ex rel.* **[UNDER SEAL]**, <br><br> Plaintiffs, <br><br> v. <br><br> **[UNDER SEAL]**, <br><br> Defendants. | CASE NO. CV 15-1339 MEJ <br><br> **AMENDED COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR:** <br><br> 1. **Violations of the Federal False Claims Act, §§ 3729(a)(1)(A); (a)(1)(B); (a)(1)(C); and (in the alternative) (a)(1)(G);** <br> 2. **Violations of California Insurance Code §§ 1871.7(a) and (b); and** <br> 3. **Wrongful Termination in Violation of Federal False Claims Act, 31 U.S.C. § 3730(h)** <br> 4. **Wrongful Termination in Violation of Cal. Gov. Code § 1102.5.** <br> 5. **Wrongful Termination in Violation of Public Policy** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)**

AMENDED COMPLAINT

1  NIALL P. McCARTHY (SBN 160175)
   nmccarthy@cpmlegal.com
2  JUSTIN T. BERGER (SBN 250346)
   jberger@cpmlegal.com
3  ADAM M. SHAPIRO (SBN 267429)
   ashapiro@cpmlegal.com
4  **COTCHETT, PITRE & McCARTHY, LLP**
   San Francisco Airport Office Center
5  840 Malcolm Road
   Burlingame, CA 94010
6  Telephone: (650) 697-6000
   Facsimile: (650) 697-0577
7
   *Attorneys for Relator*
8
                    **IN UNITED STATES DISTRICT COURT**
9
                 **FOR NORTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| 11 **UNITED STATES OF AMERICA** *ex rel.* **BRYAN BARNETTE**; and **STATE OF** | CASE NO. CV 15-1339 MEJ |
| 12 **CALIFORNIA** *ex rel.* **BRYAN BARNETTE,** | **AMENDED COMPLAINT FOR MONEY DAMAGES AND CIVIL PENALTIES FOR:** |

13                Plaintiffs,

14          v.

15  **CARDIODX, INC.**, a California corporation;
    **PHLEBOTEK CORPORATION**, a Florida
16  corporation; **DAVID LEVISON**; **DEBORAH
    KILPATRICK**; and **MISSY KEMP**,
17
                 Defendants.
18

1.  **Violations of the Federal False Claims Act, §§ 3729(a)(1)(A); (a)(1)(B); (a)(1)(C); and (in the alternative) (a)(1)(G);**
2.  **Violations of California Insurance Code §§ 1871.7(a) and (b); and**
3.  **Wrongful Termination in Violation of Federal False Claims Act, 31 U.S.C. § 3730(h)**
4.  **Wrongful Termination in Violation of Cal. Gov. Code § 1102.5.**
5.  **Wrongful Termination in Violation of Public Policy**

                       **JURY TRIAL DEMANDED**

                     **FILED UNDER SEAL
                        PURSUANT TO
                   31 U.S.C. § 3730(b)(2)**

**AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page No.

I.     INTRODUCTION ................................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................... 2

III.   PARTIES ............................................................................................................. 3

IV.    OVERVIEW OF THE CORUS CAD TEST ........................................................ 3

V.     OVERVIEW OF THE SCHEMES ...................................................................... 5

      A.     CARDIO fraudulently induced Palmetto GBA to approve the Corus CAD test for Medicare reimbursement ......................................................................... 5

      B.     CARDIO fraudulently conspired with PHLEBOTEK to pay illegal kickbacks ............. 7

      C.     CARDIO defrauded Medicare by inducing physicians to participate in a "registry" scheme ........................................................................................ 10

      D.     CARDIO defrauded Medicare by organizing and hosting unlawful screening days ... 11

      E.     CARDIO provided unlawful kickbacks by waiving patients' copays and deductible in exchange for business referrals ...................................................... 12

VI.    RETALIATION AGAINST THE RELATOR ..................................................... 13

      A.     Relator's Position at CARDIO ............................................................... 13

      B.     Retaliation Against Relator .................................................................... 15

VII.   CAUSES OF ACTION ...................................................................................... 16

FIRST CAUSE OF ACTION
On Behalf of the United States
Federal False Claims Act, Presenting False Claims 31 U.S.C. § 3729(a)(1)(A) .......... 16

SECOND CAUSE OF ACTION
On Behalf of the United States
Federal False Claims Act, Making or Using False Records or Statements Material to Payment or Approval of False Claims 31 U.S.C. § 3729(a)(1)(B) ......................... 17

THIRD CAUSE OF ACTION
On Behalf of the United States
Federal False Claims Act, Conspiracy to Commit Violations 31 U.S.C. § 3729(a)(1)(C) ................................................................................. 18

FOURTH CAUSE OF ACTION (In the Alternative)
On Behalf of the United States
Federal False Claims Act, Retention of Proceeds to Which Not Entitled 31 U.S.C. § 3729(a)(1)(G) ................................................................................ 18

FIFTH CAUSE OF ACTION
  On Behalf of the State of California
  California Insurance Frauds Prevention Act, Employment of Runner, Cappers and
  Steerers or Other Persons to Procure Patients  Cal. Ins. Code § 1871.7(a) .................. 19

SIXTH CAUSE OF ACTION
  On Behalf of the State of California
  California Insurance Frauds Prevention Act, Presenting or Causing to be Presented
  False or Fraudulent Claims for the Payment of An Injury Under A Contract of
  Insurance  Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(1) .............................. 20

SEVENTH CAUSE OF ACTION
  On Behalf of the State of California
  California Insurance Frauds Prevention Act, Knowingly Preparing or Making Any
  Writing in Support of a False or Fraudulent Claim  Cal. Ins. Code § 1871.7(b); Cal.
  Pen. Code § 550(a)(5) ................................................................................................ 21

EIGHTH CAUSE OF ACTION
  On Behalf of the State of California
  California Insurance Frauds Prevention Act, Knowingly Making or Causing to be
  Made Any False or Fraudulent Claim for Payment of a Health Benefit Cal. Ins.
  Code § 1871.7(b); Cal. Pen. Code § 550(a)(6) ............................................................ 22

NINTH CAUSE OF ACTION
  On Behalf of the State of California
  California Insurance Frauds Prevention Act, Soliciting, Accepting, and Referring
  Business To or From an Individual or Entity That Intends to Violate Section 550 of
  the Penal Code or Section 1871.4 of the Insurance Code Cal. Ins. Code § 1871.7(b);
  Cal. Pen. Code § 549 ................................................................................................. 23

TENTH CAUSE OF ACTION
  On Behalf of Relator Bryan Barnette
  Wrongful Termination in Violation of Federal False Claims Act  31 U.S.C.
  § 3730(h) .................................................................................................................... 24

ELEVENTH CAUSE OF ACTION
  On Behalf of the Relator Bryan Barnette
  Wrongful Termination in Violation of Public Policy
  Against CARDIODX ................................................................................................. 24

TWELFTH CAUSE OF ACTION On Behalf of the Relator Bryan Barnette Wrongful
  Termination in Violation of California Labor Code § 1102.5 ....................................... 25

VIII.  PRAYER FOR RELIEF ............................................................................................... 26

IX.   JURY DEMAND ......................................................................................................... 29

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

Plaintiffs UNITED STATES OF AMERICA ("United States") and STATE OF

CALIFORNIA ("California"), by and though Relator, BRYAN BARNETTE, allege as follows:

## I.   INTRODUCTION

1.      Since 2012, Defendant CARDIODX, INC. ("CARDIO") has fraudulently sought

reimbursement for medically unnecessary, excessive and ineffective cardiovascular tests.  Contrary to

CARDIO's declarations to Medicare and private insurance companies, CARDIO's Corus CAD test

provides **no benefit to Medicare covered men and less than marginal benefit to Medicare**

**covered women**.  Despite this reality, CARDIO fraudulently induced Medicare to approve the Corus

CAD test for Medicare reimbursement to the tune of $1,095.00 per test.  Additionally, to further

increase ordering of the Corus CAD test, CARDIO developed and implemented several kickback

schemes to induce physicians and their staff to refer business to it.  Defendant PHLEBOTEK

CORPORATION ("PHLEBOTEK") knowingly conspired with CARDIO to implement one of those

kickback schemes causing thousands of false claims to be submitted to Medicare and private insurers.

2.      Specifically, CARDIO submitted, or caused submission of, thousands of false claims

to the United States, and private insurers in the State of California by engaging in the following five

(5) schemes:  (1) fraudulently inducing Palmetto GBA to approve the Corus CAD test for Medicare

payment by making false representations of CARDIO's "rule out" capability; (2) conspiring with

PHLEBOTEK to engage in an illegal kickback scheme by providing physicians and medical

assistants illegal remuneration for submitting specimens to CARDIO; (3) creating an illegal registry

kickback scheme that provided physicians illegal remuneration for submitting patient data; (4)

organizing unlawful "free screening days" for Medicare patients resulting in claims for medically

unnecessary and excessive tests; and (5) providing unlawful kickbacks by waiving patients' co-pays

and deductibles.

3.      Medicare is administered by the United States government and provides health

coverage to people 65 years of age and older.  Medicare's soaring costs are staggering.  In 2013,

Medicare expenditures accounted for 14% of all federal spending.  Knowing that the federal

government lacks the ability to track the massive amount of Medicare money as it flows through the

complex healthcare delivery system, unscrupulous companies see government money as an easy

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1  source for padding their profits. Sadly, Defendants have become part of this problem through their
2  abuse of the Medicare program – a program designed to benefit senior citizens, not private
3  companies.

4      4.      This is a *qui tam* action for violation of the federal False Claims Act (31 U.S.C. §§
5  3150 *et seq.*), to recover treble damages, civil penalties and attorneys' fees and costs for Relator and
6  on behalf of the United States for fraudulent Medicare billings. Some of Defendants' schemes here
7  also caused private insurers in California to be overcharged. Accordingly, Relator brings claims
8  under California Insurance Code §1871.7, *et seq.*, to recover fraudulent charges on behalf of the
9  California Department of Insurance.

10     5.      Sadly, when former CARDIO employee and Relator BRYAN BARNETTE brought
11 these issues to the attention of CARDIO's management, rather than addressing the issues, CARDIO
12 attacked BARNETTE, and terminated his employment. During his employment with CARDIO,
13 BARNETTE met with CARDIO's Human Resources Department to discuss unethical sales practices
14 in certain territories, specifically the non-existence of any Corus-CAD rule out scores for men over
15 sixty-five, the registry kick-back schemes for doctors, the PHLEBOTEK kick-back scheme, and the
16 unlawful Medicare "free screening" days. Shortly after this meeting, BARNETTE was terminated
17 from his position at CARDIO. Under the False Claims Act and California law, BARNETTE has the
18 right to disclose information regarding unlawful business practices, without fear of retaliation.
19 Instead of investigating BARNETTE's concerns, CARDIO retaliated against BARNETTE by
20 terminating his employment.

21 **II.    JURISDICTION AND VENUE**

22     6.      This Court has jurisdiction over this action pursuant to 31 U.S.C. sections 3730(b) and
23 3732(a), which confer jurisdiction on this Court for actions brought under the federal False Claims
24 Act, and authorize nationwide service of process. Venue is proper in this district pursuant to 31
25 U.S.C. section 3732(a), as all Defendants transact business in the Northern District of California.
26 Additionally, the Court has supplemental jurisdiction over Relator's pendent state claims pursuant to
27 28 U.S.C. § 1367(a).

28

1    7.    Non-public information personally known to Relator BRYAN BARNETTE serves as

2  the basis for this action.

3  **III.    PARTIES**

4    8.    Relator, BRYAN BARNETTE ("BARNETTE"), is a former employee of CARDIO.

5  BARNETTE was employed by CARDIO from 2010 through January 2015.  BARNETTE is a citizen

6  of the State of South Carolina.

7    9.    Defendant CARDIO is a California corporation with its principal place of business at

8  600 Saginaw, Drive Redwood City, California.  CARDIO is a vascular genomic diagnostics company

9  founded in 2004.  At all times relevant hereto, CARDIO conducted business in the Northern District

10  of California.

11    10.    Defendant PHLEBOTEK CORPORATION is a phlebotomist and medical assistant

12  staffing company based in Hollywood, Florida.  PHLEBOTEK conducts business nationwide and, at

13  all times relevant hereto, conducted business in California.

14    11.    Defendant DAVID LEVISON is the founder, former Chief Executive Officer, and

15  current Chief Strategy Officer at CARDIO.  He is also on the company's board of directors.

16    12.    Defendant DEBORAH KILPATRICK is the former Chief Commercial Officer at

17  CARDIO, and was with the company from 2006 to 2014.

18    13.    Defendant MISSY KEMP is the former Director of Sales and current Senior Director

19  of Channel Development at CARDIO.

20  **IV.    OVERVIEW OF THE CORUS CAD TEST**

21    14.    CARDIO is a California based vascular genomic diagnostic corporation founded in

22  2004. CARDIO's principal product is the "Corus CAD" test.  Corus CAD is a genomic expression

23  test used for patients at risk for coronary artery disease (CAD).  The blood test measures the activity

24  of specific genes in a patient's blood that change when there is a significant narrowing or blockage of

25  arteries.

26    15.    CARDIO markets Corus CAD as a "rule out" test to identify CAD patients who

27  present with various symptoms of narrowed or blocked arteries, such as shortness of breath,

28  heartburn, chest tightness, and unexplained fatigue.  The test produces a score between one (1) and

**AMENDED COMPLAINT**                                                                                    3

forty (40). A score of fifteen (15) or less supposedly "rules out" the patient for CAD, thus verifying that the patient does not need additional testing such as heart imaging, radiation, surgery or other invasive procedures. The test is not appropriate for diabetic patients and is very expensive, billed to Medicare and other payers upwards of <u>$1,245.00, per test</u>.

16.     On or around August 8, 2012, Corus CAD was approved for Medicare Part B coverage by Palmetto GBA.[1] Part B Medicare coverage provides reimbursement for two types of services: (1) preventative services and (2) medical services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. 1395y(a)(1)(A). CARDIO's Corus CAD test is <u>not a preventative screening test</u> and is used in outpatient settings with non-diabetic, stable patients who present with typical or atypical symptoms suggestive of CAD. **<u>Therefore, every Corus CAD test conducted must be reasonable and necessary to qualify for Medicare reimbursement</u>**. Because it is such a unique test, Medicare requires the Corus CAD test to be billed under the umbrella CPT code for molecular diagnostic tests, 84999. CARDIO is the nation's second highest ordering organization of this CPT code.

17.     According to CARDIO-sponsored studies, the Corus CAD test would rule out half of all patients for further CAD testing. In fact, however, only roughly twenty (20) percent of Medicare covered women tested have ever been "ruled out" for further tests. Additionally, **no man over the age of 65 (i.e., of Medicare age) has ever been "ruled out" by Corus CAD**. These facts were not disclosed by CARDIO to Palmetto GBA. Accordingly, CARDIO fraudulently induced Palmetto GBA to extend Medicare coverage to Corus CAD, when the test is of no use to men of Medicare age, and of marginal use to women of Medicare age. Over 120,000 Corus CAD tests have been sold by CARDIO, thirty (30) to forty (40) percent of which were billed to Medicare, **at a cost to taxpayers of approximately $1,095 each**.

---

[1] On September 16, 2013, the California Medical Association transitioned all Medicare claims from Palmetto GBA to Noridian Administrative Services (Noridian). Thus, Noridian became California's new Medical Administrative Contractor (MAC).

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

1    V.    **OVERVIEW OF THE SCHEMES**

2         18.    As stated above, CARDIO submitted, or caused submission of, thousands of false

3    claims to the United States, and insurers in the State of California by engaging in the following five

4    (5) schemes:  (1) fraudulently inducing Palmetto GBA to approve the Corus CAD test for Medicare

5    payment by making false representations of CARDIO's "rule out" capability; (2) conspiring with

6    PHLEBOTEK to engage in an illegal kickback scheme by providing physicians and medical

7    assistants illegal remuneration for submitting specimens to CARDIO; (3) creating an illegal registry

8    kickback scheme that provided physicians illegal remuneration for submitting patient data; (4)

9    organizing unlawful "free screening days" for Medicare patients resulting in claims for medically

10   unnecessary and excessive tests; and (5) providing unlawful kickbacks by waiving patients' co-pays

11   and deductibles.

12        A.    *CARDIO fraudulently induced Palmetto GBA to approve the Corus CAD test for*

13              *Medicare reimbursement*

14        19.    In seeking Medicare approval, CARDIO fraudulently represented to Palmetto GBA

15   that its Corus CAD test would save taxpayer money by obviating the need for additional costly

16   testing and studies on Medicare patients.  According to CARDIO-sponsored studies, the Corus CAD

17   would "rule out" fifty (50) percent of all patients for further CAD testing.

18        20.    As stated above, in August 2012, CARDIO's Corus CAD test was approved for

19   Medicare coverage by Palmetto GBA.  Defendants DAVID LEVISON and DEBORAH

20   KILPATRICK were heavily involved in this approval process, and played key roles in inducing

21   Palmetto GBA to approve the Corus CAD test.  In obtaining Medicare coverage, CARDIO secured a

22   rare retroactive Medicare approval that allowed CARDIO to obtain reimbursements for Corus CAD

23   tests performed as early as January 1, 2012.  CARDIO was approved for reimbursement of $1,095

24   per test, with no co-pay charge to the tests' beneficiaries.  CARDIO's Medicare coverage approval

25   was a significant and lucrative milestone for the company.

26        21.    In 2013, after CARDIO was approved for Medicare coverage, CARDIO employees

27   met to discuss ways to increase CARDIO's Medicare business.  At this meeting, CARDIO's

28   marketing representative presented data showing that none of the thousands of Corus CAD tests that

1    had been run had produced "rule out" scores for men over 65 years old, and that the test had only

2    produced a rule out score for less than twenty (20) percent of women over age 65.  In response to this

3    data, multiple sales representatives questioned how CARDIO received Medicare coverage with these

4    statistics.  In response, CARDIO's Chief Commercial Officer laughed and responded, "We obviously

5    didn't tell them that."  CARDIO employees spent the remainder of the meeting developing a new

6    marketing message for its Corus CAD test.[2]

7         22.     CARDIO thus fraudulently induced Palmetto GBA to extend Medicare coverage to

8    its Corus CAD test, when the test is of <u>no use to men of Medicare age, and of marginal use to women</u>

9    <u>of Medicare age</u>.  Over 120,000 Corus CAD tests have been sold by CARDIO, thirty (30) to forty

10   (40) percent of which were billed to Medicare, <u>at a cost to taxpayers of approximately $1,095 each</u>.

11   CARDIO's fraudulent inducement renders false every claim it submitted to Medicare.

12        23.     Additionally, CARDIO violated the False Claims Act by submitting, or causing the

13   submission of, claims for payment for laboratory testing services that CARDIO knew were not

14   medically necessary.  Section 1862 of the Social Security Act provides, in pertinent part:

15   "Notwithstanding any other provision of this title, no payment may be made under [Medicare] for

16   any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the

17   diagnosis or treatment of illness or injury or to improve the functioning of a malformed body

18   member." 42 U.S.C. 1395y(a)(1)(A).

19        24.     CARDIO violated 42 U.S.C. 1395y(a)(1)(A) by billing for medically unnecessary

20   laboratory tests.  Here, every Corus CAD test submitted for reimbursement violated federal law

21   because the Corus CAD test was fundamentally medically ineffective because no Medicare covered

22   men and little to no Medicare covered women were ever "ruled out."  Rather than saving taxpayer

23

24   _____

[2] After this meeting, CARDIO developed a new marketing strategy to increase use of its Corus CAD

25   test.  CARDIO's new messaging presented Corus CAD as a "disease burden" test, asserting that, if the patient
     had a high CAD score, he/she had a higher likelihood of cardiovascular disease.  In presenting this message,

26   CARDIO informed physicians that the test could be <u>used on all patients, whether or not they showed signs of</u>
     <u>CAD</u>.  CARDIO, however, continued to present Corus CAD as a "rule out" test to all managed care

27   organizations, including Medicare.  On a number of occasions, CARDIO employees voiced their concerns
     about these mixed messages, especially since CARDIO did not conduct a study specifically to support the

28   "disease burden" messaging.  Attached as <u>Exhibit 27</u> is a PowerPoint Presentation created by CARDIO that
     discusses the disease burden message.

1  money by "ruling out" CAD risk, CARDIO caused a massive increase in Medicare spending on

2  unreasonable and unnecessary Corus CAD tests.

3         **B.**   ***CARDIO fraudulently conspired with PHLEBOTEK to pay illegal kickbacks***

4       25.    CARDIO, to induce physicians to order Corus CAD tests, conspired with

5  PHLEBOTEK to enter into sham phlebotomy contracts with physician offices. PHLEBOTEK is a

6  nationwide company that provides per diem, contract, temporary, part-time, and direct hire

7  phlebotomists and medical assistants to every segment of the health care industry. Based on its

8  arrangement with CARDIO, PHLEBOTEK and CARDIO Sales Representatives visited physician

9  offices and approached medical staff with offers to become "independent contractors" of

10  PHLEBOTEK. Specifically, medical staff members were told that they could work as "independent

11  contractors" of PHLEBOTEK and receive compensation for every Corus CAD test they submitted to

12  CARDIO, in addition to their standard wages from the physician or clinic. This was a sham designed

13  to provide remuneration to physicians and their staff in exchange for Corus CAD orders.

14       26.    CARDIO paid PHLEBOTEK a $25 draw and collection fee, per patient. From this

15  payment, PHLEBOTEK kept approximately $6, and forwarded the remaining $19 to its "independent

16  contractors." This arrangement allowed medical staff to essentially double their income.

17  PHLEBOTEK's "independent contractors" would suggest, recommend, and encourage physicians to

18  order Corus CAD tests for their patients.[3] Physicians would order Corus CAD tests to appease their

19  medical staff, and in some cases, to obtain a portion of the medical staff's kickback. This substantial

20  incentive typically caused a significant uptick in business, with PHLEBOTEK "independent

21  contractors" regularly submitting at least ten (10) to fifteen (15) Corus CAD tests a day to CARDIO.

22  _____

23  [3] CARDIO's practice of allowing medical staff to suggest, recommend, encourage and place Corus CAD tests also violated federal law. All diagnostic tests "must be ordered by the physician who furnishes a consultation or treats a beneficiary for a specific medical problem . . ." and "tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." 42 C.F.R. § 410.32(a). Because CARDIO paid kickbacks to medical staff, CARDIO incentivized them to become more involved in the medical test ordering process than appropriate. In some cases, medical staff circumvented legal requirements by completing the patient's preliminary requisition forms, drawing the patient's blood, and submitting the specimen to CARDIO for testing. Because these tests were ordered by non-physicians, they were both unreasonable and unnecessary. Additionally, even when licensed physicians did order the Corus CAD test, such tests were heavily encouraged by medical staff and ordered only after <u>a perfunctory medical examination of patients showing no signs of CAD</u>. Thus, all Corus CAD tests arising from physicians who conducted a cursory exam or no exam at all are therefore unreasonable and unnecessary.

27. As word spread among CARDIO's sales staff about the "PHLEBOTEK deal," PHLEBOTEK became the go-to company for CARDIO CAD tests. After CARDIO's arrangement with PHLEBOTEK commenced, CARDIO's testing volume increased dramatically. By 2014, PHLEBOTEK draws accounted for approximately seventy (70) percent of CARDIO's business. CARDIO's arrangement with PHLEBOTEK was a deliberate violation of anti-kickback statutes.

28. Standard industry practice allows for the laboratory to pay physicians and medical assistants a nominal fee for the small amount of time it takes to draw, collect and package the specimen. Medicare, for example, provides a $3 payment to physicians for drawing a specimen.

29. According to the Department of Health and Human Services, Office of Inspector General (OIG), when a laboratory pays a referring physician for performing blood draws, and where the amount exceeds $3, "an inference arises that the compensation is paid as an inducement to the physician to refer patients to the laboratory." OIG Advisory Opinion No. 05-08, page 4.

30. Here, CARDIO pays PHLEBOTEK a $25 draw fee per patient, and PHLEBOTEK forwards $19 of that fee to medical staff and physicians. This remuneration is illegal as it induces medical assistants and physicians to order the Corus CAD test.

31. Defendants' practices are an unlawful kickback scheme, strictly prohibited by the Medicare statutes, and give rise to False Claims Act liability. Specifically, 42 U.S.C. § 1320a-7b(b)(2)(A) creates liability for "whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) *directly or indirectly, overtly or covertly*, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . ." 42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added).

32. Interpretations of this language by the federal authorities provide useful guidance in applying these anti-kickback laws, and establish that Defendants have violated the anti-kickback laws of the United States through the conduct described herein. For example, in June 2005, the OIG issued an Advisory Opinion concluding that payments by a laboratory to referring physicians of $6 per day for "collection of blood samples," likely constituted "prohibited remuneration under the anti-

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1  kickback statute." OIG Advisory Opinion No. 05-08, at pp. 1-2.  Specifically, the OIG concluded

2  that:

3        33.    Where a laboratory pays a referring physician to perform blood draws, particularly

4  where the amount paid is more than the laboratory receives in Medicare reimbursement, an inference

5  arises that the compensation is paid as an inducement to the physician to refer patients to the

6  laboratory . . . .

7           . . . . Because the physicians would receive a portion of the Lab's
   reimbursement for blood tests resulting from the physicians' referrals, **the**
8  **physicians have a strong incentive to order more blood tests.  As a result,**
   **there is a risk of overutilization and inappropriate higher costs to the**
9  **Federal health care programs.**

10  *Id.* at p. 4.

11        34.    The "collection" and "draw" fees paid by CARDIO to referring providers in this case

12  are no different.[4]  As in the "collection" fees paid in the Advisory Opinion's scenario, the

13  "packaging" fee and other "compensation provides an obvious financial benefit to the referring

14  physician, and it may be inferred that this benefit would be in exchange for referrals to the Lab."

15  OIG Advisory Opinion No. 05-08, at p. 4.  Currently, Medicare pays a $3.00 "draw fee," for

16  collecting physicians.  The "packaging" and "collection" fees paid by Defendants are many multiples

17  of this Medicare draw fee.  This alone gives rise to an inference of illegal remuneration.  Moreover,

18  as in the scenario considered by the OIG's Advisory Opinion, the "packaging" fees and other

19  remuneration provided by CARDIO have the effect of incentivizing physicians to order more tests,

20  creating a "risk of overutilization and inappropriate higher costs to the Federal health care programs."

21  *See Id.* at p. 4.

22        35.    CARDIO presented to Medicare claims for reimbursement of laboratory tests which

23  were neither reasonable nor necessary but were ordered by physicians in exchange for kickbacks.

24  PHLEBOTEK, in conspiring with CARDIO, also caused thousands of submissions of reimbursement

25  claims for laboratory tests that were not medically necessary.  As such, each of these claims

26

27  [4] CARDIO also routinely paid physicians $7 per patient in "packaging fees."  However, CARDIO stopped engaging in this
    practice after the OIG issued an Advisory opinion in June 2014, warning against engaging in this unlawful practice. *See*
28  OIG Special Fraud Alert: Laboratory Payments to Referring Physicians, p. 6 (June 2014).

constitutes a false claim in violation of the False Claims Act (31 U.S.C. § 3729 *et seq.*). Defendants certified, both explicitly and implicitly, that each claim they submitted to Medicare would fully comply with all statutes and regulations, and that as Medicare providers they would comply with all pertinent statutes and regulations.

### C. ***CARDIO defrauded Medicare by inducing physicians to participate in a "registry" scheme***

36. CARDIO has engaged in a widespread "registry" kickback scheme with various physicians and clinics. Specifically, CARDIO induced the ordering of its tests—including tests ultimately billed to Medicare—by paying physicians up to $250 per patient to participate in patient "registries." According to the OIG's Special Fraud Alert entitled "Laboratory Payments to Referring Physicians," registry arrangements risk inducing physicians to order medically unnecessary and duplicative tests. *See* OIG Special Fraud Alert: Laboratory Payments to Referring Physicians, p. 5-6 (June 2014). The OIG also detailed several registry arrangements that are evidence of unlawful practices. *Id.* These arrangements include: (1) compensation paid to physicians pursuant to registry arrangements on a per patient basis or other basis that takes into account the value or volume of referrals; (2) compensation paid to physicians pursuant to registry arrangements that are not fair market value for the physicians' efforts in collecting and reporting the data; and (3) registry arrangements offered by laboratories centered on tests which it obtained patents or exclusively performs. *Id.*

37. CARDIO's registry kickback scheme falls squarely within the OIG's description of an illegal scheme created to induce physicians to order medically unnecessary and duplicative tests. Here, CARDIO paid compensation to physicians on a per patient basis pursuant to a registry arrangement, under the guise of conducting patient studies. Physicians were paid up to $250 for entering basic data about their patients and outcomes—information the physicians are required to include in their standard charts anyway. Thus, $250 is not a fair market value for the physicians' efforts in reporting patient data. Physicians simply transferred data from one medium to another and expended little to no effort to enter patient information into the CARDIO registry. Additionally, this registry arrangement was centered on the Corus CAD test, a test that only CARDIO has patents to

LAW OFFICES
COTCHETT, PITRE & MCCARTHY, LLP

1   perform. Thus, CARDIO's registry program was merely pretense for paying kickbacks to illegally

2   induce the referral of Medicare testing.

3       38.    Here, because CARDIO paid kickbacks to physicians through its registry scheme,

4   physicians were induced to order Corus CAD tests for as many patients as possible and input patient

5   data into CARDIO's registry, often times disregarding if the test was medically necessary.

6   Therefore, CARDIO again violated 42 U.S.C. 1395y(a)(1)(A).  CARDIO presented to Medicare

7   claims for reimbursement of laboratory tests which were neither reasonable nor necessary but were

8   ordered by physicians in exchange for kickbacks.  As such, each of these claims constitutes a false

9   claim in violation of the False Claims Act (31 U.S.C. § 3729 *et seq.*).

10       39.    At all times relevant hereto, CARDIO knew that federal law prohibited its giving or

11   receiving these kickbacks.  CARDIO certified, both explicitly and implicitly, that each claim it

12   submitted to Medicare would fully comply with all statutes and regulations, including the anti-

13   kickback provisions, and that as a Medicare provider, it would comply with all pertinent statutes and

14   regulations, including the anti-kickback provisions.

15       40.    From at least 2012 to present, CARDIO has submitted hundreds of thousands of such

16   claims for payments, and received tens, if not hundreds, of millions of dollars from the Government

17   as a result of these illegal kickbacks.

18       **D.**    ***CARDIO defrauded Medicare by organizing and hosting unlawful screening days***

19       41.    CARDIO also engaged in unlawful "free screening days" by hosting events where

20   seniors could obtain "free" cardiovascular screenings at their local recreation center, school, or hotel.

21   These "free screening days" were marketed specifically to Medicare beneficiaries and were organized

22   to improve CARDIO's Sales Representatives' overall rank and compensation.

23       42.    For example, a typical, high ranking CARDIO Sales Representative submitted

24   approximately ten (10) to fifteen (15) tests per day.  However, when a standard, low performing,

25   Sales Representative advertised, organized and hosted "free screening days," this representative was

26   able to submit over ninety (90) tests in a single day, therefore excelling to CARDIO's top ranks.  For

27   each test submitted, Medicare was billed $1,245 and paid $1,095.  Because of their increased Corus

28

1  CAD submissions, these Sales Representatives were given bonuses and awards for meeting, and in

2  some cases, exceeding Medicare billing quotas.

3       43.    These "pops" or "spikes" of Corus CAD tests arising from traditionally low

4  performing areas were obvious red flags for unnecessary testing. Although CARDIO asserted a

5  policy against "free screening days," CARDIO never attempted to investigate, stop, or alter these

6  fraudulent practices.

7       44.    During these "free screening days," CARDIO typically arranged for a medical

8  provider to draw the patient's blood and submit the specimen for Corus CAD testing after a cursory

9  examination—or in many cases, with no exam at all. Even if patients were not experiencing

10 symptoms that would warrant a Corus CAD test, CARDIO's Sales Representatives allowed medical

11 assistants to collect specimens, and subsequently billed Medicare $1,245, per test.

12      45.    CARDIO's "free screening days" led to medically unnecessary testing for as many

13 patients as possible, in disregard of medical necessity. Medicare was then billed $1,245, per test even

14 if the test was ordered after cursory examinations, and in most cases, no exam at all. These tests were

15 therefore unnecessary and unreasonable and a violation of 42 U.S.C. 1395y(a)(1)(A). As such each

16 of these claims constitute a false claim in violation of the False Claims Act (31 U.S.C. § 3729 *et*

17 *seq.*).

18     E.    ***CARDIO provided unlawful kickbacks by waiving patients' copays and deductible in***

19           ***exchange for business referrals***

20      46.    Lastly, CARDIO defrauded Medicare and private insurers by routinely waiving

21 patients' deductibles or copays as incentive for physicians to refer business to CARDIO. CARDIO's

22 Sales Representatives met with physicians and encouraged them to order Corus CAD tests for their

23 non-Medicare and Medicare covered patients. In doing so, CARDIO promised to waive patients'

24 private insurance co-payments and deductibles.

25      47.    Typically, private insurance companies require that a patient ordering a laboratory test

26 make a co-payment of approximately 20% of allowable charges to the laboratory. Private insurance

27 companies may also require their patients to make a deductible payment to the laboratory until the

28 patient has met his/her deductible amount for the year. Although co-payments and deductibles can be

**AMENDED COMPLAINT**                                     12

1   a financial burden to patients, especially to those seeking treatment for coronary artery disease,

2   service providers are required to make all necessary efforts to collect co-payments from patients, with

3   limited exceptions.

4        48.    Accordingly, waivers of private insurance co-payments and deductibles are significant

5   benefits that physicians can provide to their patients because they allow their patients to save money

6   in the long run.  Physicians therefore market these waivers to their patients to make their offices more

7   appealing, thereby improving the physicians' overall revenue and ratings.  These waivers also save

8   physicians from having to deal with patients upset over large co-payments for questionable laboratory

9   tests.

10        49.    Knowing this, CARDIO promised physicians that it would not collect co-payments or

11   deductibles.  Although CARDIO lost money on uncollected co-payments and deductibles, it more

12   than made up the difference with the profits it earned on the referral business.

13        50.    Waiving co-payments and deductibles in this manner, to induce physicians to order

14   tests, constitutes illegal inducement, strictly prohibited by anti-kickback laws.  *See* 42 U.S.C. §1320a-

15   7a. As discussed above, anti-kickback statutes prohibits the knowing and willful remuneration

16   (including discounts) even if <u>one</u> purpose of the remuneration is to induce or reward referrals of

17   Federal health care program business.  By engaging in this unlawful conduct, CARDIO also

18   encouraged the submission of medically unreasonable and unnecessary tests, thereby violating 42

19   U.S.C. 1395y(a)(1)(A).  As such, each of these claims constitutes a false claim in violation of the

20   False Claims Act (31 U.S.C. § 3729 *et seq*.), and the California Insurance Code.

21   **VI.    <u>RETALIATION AGAINST THE RELATOR</u>**

22        51.    BARNETTE investigated and reported the fraudulent conduct of CARDIO.  In

23   response, CARDIO attempted to cover up its scheme by discharging BARNETTE.

24        **A.    *Relator's Position at CARDIO***

25        52.    BARNETTE has over ten (10) years of experience in the medical industry.  In April

26   2010, BARNETTE was recruited by CARDIO to sell its Corus CAD tests.  At a second round of

27   interviews, CARDIO's Chief Commercial Officer, met with BARNETTE.  During this interview, the

28   CCO successfully persuaded BARNETTE to leave his employer and begin working for CARDIO.  At

this time, CARDIO's team of ten (10) sales representatives was selling Corus CAD tests to cardiologist for $1,195 per test.[5] Eighty-five (85) percent of CARDIO's business was attributable to two sales representatives, one based in Kentucky and the other in Arizona, with the top sales representative in Arizona averaging sales of 600 CAD tests per quarter.

53.    In 2010, BARNETTE began working for CARDIO as the company's first territory sales manager for the state of South Carolina.  BARNETTE reported to the Vice President of Sales for CARDIO.  During his first quarter at CARDIO, BARNETTE sold 450 tests.

54.    By his second quarter, BARNETTE sold 750 tests.  Later in 2010, BARNETTE was recognized at as the Rookie of the Year for his successful sales, which accounted for thirty (30) percent of CARDIO's business that year.  BARNETTE consistently ranked as one of the top sales representatives for CARDIO.

55.    In April 2013, CARDIO sought to expand, including hiring new representatives and creating additional management positions.  Around this time, CARDIO hired MARK WILLIG ("WILLIG") to replace its Vice President of Sales as well as two additional Regional Sales Managers for the Northeast.  Thereafter, BARNETTE reported to WILLIG and was promoted to CARDIO's Regional Sales Manager, for the Southeast region.  BARNETTE's region covered Georgia, South Carolina, North Carolina, and Florida.  As the Regional Sales Manager, BARNETTE managed a staff of eight (8) sales representatives as well as conducted direct sales.  BARNETTE continued to rank among the top performing sales managers, never falling out of the top three Regional Managers at CARDIO.

56.    WILLIG's attitude towards BARNETTE dramatically changed after BARNETTE was unable to attend one of CARDIO's national sales meeting due to a prescheduled vacation out of the country.  Following the meeting, WILLIG drafted a negative performance review for BARNETTE, despite BARNETTE's continued success and rave reviews among his peers and clients.  During this time, BARNETTE also learned that, although he had never fallen short of the top three sales

---

[5] This amount later increased to $1,245, per test.

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1 | representatives for CARDIO, his salary was $15,000 to $20,000 less than his peers that were brought
2 | in from outside CARDIO.

3 | **B.**   _Retaliation Against Relator_

4 | 57.   During its regular conference calls, CARDIO acknowledged high performers.

5 | Throughout these conference calls, BARNETTE consistently raised concerns about typically low

6 | performing territories having "pops" or unusual "spikes" in their sales numbers. BARNETTE

7 | regularly requested that the sales representatives share their strategies company-wide as best practices

8 | or reevaluate their practices as the sales were likely achieved through fraud and needed to stop.

9 | Based on conversations with CARDIO's Managed Care department, BARNETTE believed these

10 | sales practices jeopardized CARDIO's Medicare eligibility. However, BARNETTE's warnings were

11 | ignored. CARDIO continued its fraudulent schemes in order to demonstrate favorable sales numbers

12 | to its capital investors.

13 | 58.   By October 2014, BARNETTE's working experience was unavoidably hostile and

14 | CARDIO's sales practices were increasingly contrary to established billing regulations. BARNETTE

15 | decided to seek assistance from CARDIO's Human Resources Department. On or around October 1,

16 | 2014, BARNETTE spoke with GWEN CARSCADDEN ("CARSCADDEN"), Vice President of

17 | Human Resources, about WILLIG's harassment, the salary differentials, and the unethical sales

18 | practices in certain territories. Specifically, BARNETTE highlighted the non-existence of any Corus-

19 | CAD rule out scores for men over sixty-five, the registry kickback schemes for doctors, the

20 | PHLEBOTEK kickback scheme, and the unlawful Medicare "free screening" days.

21 | 59.   CARSCADDEN never addressed BARNETTE's concerns regarding CARDIO's

22 | illegal activities. Instead, on January 19, 2015, CARDIO terminated BARNETTE.

23 | 60.   Within hours of his termination, CARDIO instructed the entire company to avoid

24 | contacting or receiving calls from BARNETTE. However, CARDIO Sales Representatives familiar

25 | with BARNETTE's upstanding reputation called BARNETTE to inform BARNETTE that CARDIO

26 | executives had been attempting to "dig up dirt" on him since late October 2014 (when he voiced his

27 | concerns to CARSCADDEN). Several of BARNETTE's sales representatives stated that, in response

28 | to CARDIO's inquiries, they told CARDIO that BARNETTE had always acted professionally and

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

1  lawfully.  Unable to "dig up" information on BARNETTE, CARDIO terminated BARNETTE for

2  unspecified, unsubstantiated "unethical behavior."

3  **VII.   CAUSES OF ACTION**

4                    **FIRST CAUSE OF ACTION**

5                  **On Behalf of the United States**

6        **Federal False Claims Act, Presenting False Claims**

7                     **31 U.S.C. § 3729(a)(1)(A)**

8       **Against CARDIO, PHLEBOTEK, LEVISON & KILPATRICK**

9        61.    Plaintiffs incorporate by reference and reallege all of the allegations contained in

10 paragraphs 1 through 59 of this Complaint as though fully set forth herein.

11       62.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) presented or caused to

12 be presented false claims for payment or approval to an officer or employee of the United States.

13       63.    Defendants knowingly presented, or caused to be presented, false records and

14 statements, including but not limited to bills, invoices, requests for reimbursement, and records of

15 services, in order to obtain payment or approval of charges by the Medicare program.  Among other

16 things, Defendants knowingly submitted false claims to Medicare for tests that were obtained by

17 means of, and as a result of, illegal kickbacks, for tests that were approved for Medicare

18 reimbursement based on fraudulent statements and admissions, and for tests that were medically

19 unnecessary.

20       64.    Defendants knowingly made, used, and caused to be made and used false certifications

21 that their claims, and all documents and data upon which those claims were based, were accurate, and

22 were supplied in full compliance with all applicable statutes and regulations.

23       65.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(A) and was a substantial

24 factor in causing the United States to sustain damages in an amount according to proof.

25 ///

26 ///

27 ///

28 ///

**SECOND CAUSE OF ACTION**

**On Behalf of the United States**

**Federal False Claims Act, Making or Using False Records or Statements**

**Material to Payment or Approval of False Claims**

**31 U.S.C. § 3729(a)(1)(B)**

**Against CARDIO, PHLEBOTEK, LEVISON & KILPATRICK**

66.     Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 59 of this Complaint as though fully set forth herein.

67.     Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) made, used, or caused to be made or used false records or statements material to false or fraudulent claims.

68.     Defendants knowingly made, used, and/or caused to be made and used false records and statements, including but not limited to bills, invoices, requests for reimbursement, and records of services, that were material to the payment or approval of charges by the Medicare program that were higher than they were permitted to claim or charge by applicable law.  Among other things, Defendants made and used supporting documentation for tests were approved for Medicare reimbursement based on fraudulent statements and admissions, and for tests that were medically unnecessary.

69.     Defendants knowingly made, used, and caused to be made and used false certifications that its claims, and all documents and data upon which those claims were based, were accurate, and were supplied in full compliance with all applicable statutes and regulations.

70.     The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(B) and was a substantial factor in causing the United States to sustain damages in an amount according to proof.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**AMENDED COMPLAINT**                                                                                           17

1    **THIRD CAUSE OF ACTION**

2    **On Behalf of the United States**

3    **Federal False Claims Act, Conspiracy to Commit Violations**

4    **31 U.S.C. § 3729(a)(1)(C)**

5    **Against CARDIO, PHLEBOTEK, LEVISON & KILPATRICK**

6        71.    Plaintiffs incorporate by reference and reallege all of the allegations contained in

7    paragraphs 1 through 59 of this Complaint as though fully set forth herein.

8        72.    Defendants knowingly (as defined in 31 U.S.C. § 3729(b)(1)) conspired to commit

9    violations of substantive portions of the False Claims Act, including but not limited to subparagraphs

10   (A), (B), and (G) of 31 U.S.C. § 3729.

11       73.    Defendants conspired to:  (1) knowingly present false records and statements; (2)

12   knowingly make, use, and/or cause to be made and used false records and statements; and (3)

13   knowingly make, use, or cause to be made or used, a false record or statement material to an

14   obligation to pay or transmit money or property to the Government, or knowingly concealed or

15   knowingly and improperly avoided or decreased an obligation to pay or transmit money or property

16   to the Government.

17       74.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(C) and was a substantial

18   factor in causing the United States to sustain damages in an amount according to proof.

19   **FOURTH CAUSE OF ACTION**

20   **(In the Alternative)**

21   **On Behalf of the United States**

22   **Federal False Claims Act, Retention of Proceeds to Which Not Entitled**

23   **31 U.S.C. § 3729(a)(1)(G)**

24   **Against CARDIO, PHLEBOTEK, LEVISON & KILPATRICK**

25       75.    Plaintiffs incorporate by reference and reallege all of the allegations contained in

26   paragraphs 1 through 59 of this Complaint as though fully set forth herein.

27       76.    In the alternative, Defendants knowingly made, used, or caused to be made or used, a

28   false record or statement material to an obligation to pay or transmit money or property to the

1   Government, or knowingly concealed or knowingly and improperly avoided or decreased an

2   obligation to pay or transmit money or property to the Government.

3       77.    As discussed above, Defendants received far more money from the Medicare

4   programs than they were entitled to. Defendants knew that they had received more money than they

5   were entitled to, and avoided their obligation to return the excess money to the Government.

6       78.    The conduct of Defendants violated 31 U.S.C. § 3729(a)(1)(G) and was a substantial

7   factor in causing the United States to sustain damages in an amount according to proof.

8                 **FIFTH CAUSE OF ACTION**

9                 **On Behalf of the State of California**

10  **California Insurance Frauds Prevention Act, Employment of Runner, Cappers and Steerers or**

11                **Other Persons to Procure Patients**

12                **Cal. Ins. Code § 1871.7(a)**

13        **Against CARDIO, PHLEBOTEK, LEVISON & KILPATRICK**

14      79.    Plaintiffs incorporate by reference and reallege all of the allegations contained in

15  paragraphs 1 through 59 of this Complaint as though fully set forth herein.

16      80.    Pursuant to California Insurance Code §1871.7(a), it is unlawful to knowingly employ

17  runners, cappers, steerers, or other persons to procure patients for the purpose of submitting a claim

18  to that patient's insurance carrier.

19      81.    Defendants unlawfully incentivized physicians by waiving copays and deductibles and

20  paying illegal remuneration in the form of kickbacks for the purpose of procuring more physicians to

21  order Corus CAD tests, which were ultimately submitted to Medicare and private insurance

22  companies for reimbursements. Defendants conspired together, and did so in order to submit claims

23  for payment to insurance carriers in violation of Cal. Ins. Code §1871.7(a).

24      82.    Because the claims submitted to medical insurers by Defendants were procured by

25  runners, cappers, and steerers and other persons, these claims were false and fraudulent under the

26  California Insurance Frauds Prevention Act.

27      83.    This conduct was a substantial factor causing damages detailed herein.

28

## SIXTH CAUSE OF ACTION

### On Behalf of the State of California

### California Insurance Frauds Prevention Act, Presenting or Causing to be Presented False or

### Fraudulent Claims for the Payment of An Injury Under A Contract of Insurance

### Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(1)

### Against CARDIO, PHLEBOTEK, LEVISON & KILPATRICK

84.     Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 59 of this Complaint as though fully set forth herein.

85.     Defendants have all either knowingly presented or caused to be presented false and fraudulent claims for reimbursement of Corus CAD tests, or conspired to present or cause to be presented such false and fraudulent claims.

86.     These claims were fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.
- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests at the rate of $1,245, per test.
- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

87.     Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

88.     This conduct was a substantial factor causing damages detailed herein.

///
///
///
///
///
///

AMENDED COMPLAINT                                                        20

### SEVENTH CAUSE OF ACTION

#### On Behalf of the State of California

#### California Insurance Frauds Prevention Act, Knowingly Preparing or Making Any Writing in Support of a False or Fraudulent Claim

#### Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(5)

#### Against CARDIO, PHLEBOTEK, LEVISON & KILPATRICK

89.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 59 of this Complaint as though fully set forth herein.

90.    Defendants have all either knowingly prepared, made, or subscribed a writing with an intent to present or use it, or to allow it to be presented, in support of false and fraudulent claims for the reimbursement of Corus CAD tests performed on patients, or have aided, abetted, and solicited, or conspired to make, or subscribe such a writing.

91.    These writings include bills for payment presented to insurance carriers for payment, and invoices prepared in support of such bills for payment.  Such bills for payment constitute false or fraudulent claims because through those bills:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests at the rate of $1,245, per test.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

92.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

93.    This conduct was a substantial factor causing damages detailed herein.

/ / /

/ / /

/ / /

**EIGHTH CAUSE OF ACTION**

**On Behalf of the State of California**

**California Insurance Frauds Prevention Act, Knowingly Making or Causing to be Made Any False or Fraudulent Claim for Payment of a Health Benefit**

**Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 550(a)(6)**

**Against CARDIO, PHLEBOTEK, LEVISON & KILPATRICK**

94.    Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 59 of this Complaint as though fully set forth herein.

95.    Defendants have all either knowingly presented or caused to be presented false and fraudulent claims for reimbursement of Corus CAD tests performed on patients, or have aided, abetted, and solicited, or conspired to present or cause to be presented such false and fraudulent claims.

96.    The claims were false or fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.
- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests at the rate of $1,245, per test.
- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

97.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

98.    This conduct was a substantial factor causing damages detailed herein.

/ / /
/ / /
/ / /
/ / /
/ / /

# NINTH CAUSE OF ACTION

## On Behalf of the State of California

**California Insurance Frauds Prevention Act, Soliciting, Accepting, and Referring Business To or From an Individual or Entity That Intends to Violate Section 550 of the Penal Code or Section 1871.4 of the Insurance Code**

### Cal. Ins. Code § 1871.7(b); Cal. Pen. Code § 549

### Against CARDIO, PHLEBOTEK, LEVISON & KILPATRICK

99.     Plaintiffs incorporate by reference and reallege all of the allegations contained in paragraphs 1 through 59 of this Complaint as though fully set forth herein.

100.    Defendants have solicited, accepted, or referred business to or from an entity or individual that intended to violate Section 550 of the Penal Code or Section 1871.4 of the Insurance Code.

101.    The claims were false or fraudulent because:

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for medically unreasonable and unnecessary tests.

- Defendants knowingly billed Medicare and private insurers for medically unnecessary and unreasonable tests at the rate of $1,245, per test.

- Defendants knowingly sought and falsely represented that they were entitled to reimbursement for tests that were procured by means of, or otherwise involved, the payment of illegal kickbacks.

102.    Defendants either directly presented such false claims for payment to insurers, or caused such false claims to be presented.

103.    This conduct was a substantial factor causing damages detailed herein.

/ / /
/ / /
/ / /
/ / /
/ / /

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

## TENTH CAUSE OF ACTION

### On Behalf of Relator Bryan Barnette

### Wrongful Termination in Violation of Federal False Claims Act

### 31 U.S.C. § 3730(h)

### Against CARDIODX

104.    Relator incorporates by reference and reallege all of the allegations contained in paragraphs 1 through 59 of this Complaint as though fully set forth herein.

105.    Defendant is covered by this retaliatory discharge statute, 31 U.S.C. § 3730(h), because it seeks reimbursement from the government for providing services to patients covered by Medicare.

106.    On October 1, 2014, during a meeting with CARDIO's Vice President of Human Resources, Relator told Defendant about unethical sales practices in certain territories, including the non-existence of any Corus-CAD rule out scores for men over sixty-five, the registry kick-back schemes for physicians, the PHELBOTEK kick-back scheme, and the unlawful Medicare "free screening" days.

107.    As a cause of his reporting, investigating, complaining of, and attempting to stop the fraudulent conduct of Defendant, Relator was discharged by Defendant because of the lawful protected conduct and acts done in furtherance of an action under 31 U.S.C. § 3730(h).

108.    Relator has suffered damages, including, but not limited to, loss of salary, commissions, annual merit increases, benefits, incentive and restricted stock options, and other valuable employee benefits.

### ELEVENTH CAUSE OF ACTION

### On Behalf of the Relator Bryan Barnette

### Wrongful Termination in Violation of Public Policy

### Against CARDIODX

109.    Relator incorporates by reference and reallege all of the allegations contained in paragraphs 1 through 59 of this Complaint as though fully set forth herein.

110.    On October 1, 2014, during a meeting with CARDIO's Vice President of Human

LAW OFFICES
COTCHETT, PITRE &
MCCARTHY, LLP

Resources, Relator told Defendant about unethical sales practices in certain territories, including the non-existence of any Corus-CAD rule out scores for men over sixty-five, the registry kick-back schemes for physicians, the PHELBOTEK kick-back scheme, and the unlawful Medicare "free screening" days.

111. Defendant knew that Relator had engaged in the protected activity of reporting unlawful business practices to CARDIO's Human Resources Department.

112. Shortly thereafter, Relator was terminated from his position at CARDIO.

113. The protected conduct, activity, and acts were the motivating and contributing factors in the termination of Relator's employment from CARDIO.

114. Defendant's retaliatory conduct toward BARNETTE was in violation of public policies pursuant to California Government Code § 1102.5.

115. As a direct and proximate cause of Defendant's wrongful retaliatory conduct, Relator has suffered damages, including, but not limited to, loss of salary, commissions, annual merit increases, benefits, incentive and restricted stock options, and other valuable employee benefits.

116. Additionally, the actions of Defendant were carried out in a deliberate manner in conscious disregard of the rights of Relator and were malicious, despicable and were intended to harm him. Relator is therefore entitled to punitive damages against Defendant in an amount sufficient to punish defendant, and to deter future similar misconduct.

### TWELFTH CAUSE OF ACTION

#### On Behalf of the Relator Bryan Barnette

#### Wrongful Termination in Violation of California Labor Code § 1102.5

#### Against CARDIODX and MISSY KEMP

117. Relator incorporates by reference and reallege all of the allegations contained in paragraphs 1 through 59 of this Complaint as though fully set forth herein.

118. Relator had reasonable cause to believe that Cardio had violated state law by, inter alia, falsely representing that it was entitled to reimbursement for medically unreasonable and unnecessary tests.

119.   Relator disclosed to CARDIO and MISSY KEMP his belief that the law had been violated.

120.   CARDIO and MISSY KEMP had authority over Relator, and had authority to investigate, discover, or correct the violations raised by Relator.

121.   CARDIO and MISSY KEMP retaliated against Relator for internally reporting that information, and based upon the belief that Relator could report that information to legal authorities. CARDIO and MISSY KEMP retaliated by terminating Relator's employment.

122.   CARDIO and MISSY KEMP's conduct was in violation of California Labor Code § 1102.5.

123.   As a direct and proximate cause of CARDIO and MISSY KEMP's wrongful conduct, Relator has suffered damages, including, but not limited to loss of salary and other valuable employee benefits all in an amount according to proof.

## VIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, by and through Relator BRYAN BARNETTE, pray judgment in their favor and against Defendants as follows:

1.   That judgment be entered in favor of Plaintiff UNITED STATES OF AMERICA ex rel. BRYAN BARNETTE, and against Defendants CARDIODX INC., PHLEBOTEK CORPORATION, DAVID LEVISON, DEBORAH KILPATRICK, AND MISSY KEMP according to proof, as follows:

    a.   On the **First Cause of Action** (Presenting False Claims (31 U.S.C. § 3729(a)(1)(A))) damages as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

        i.   Triple the amount of damages sustained by the Government;

        ii.   Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

        iii.   Recovery of costs;

        iv.   Pre- and post-judgment interest;

        v.   Such other and further relief as the Court deems just and proper;

b.    On the **Second Cause of Action** (False Claims Act; Making or Using False Records or Statements Material to Payment or Approval of False Claims (31 U.S.C. § 3729(a)(1)(B))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

      i.    Triple the amount of damages sustained by the Government;

      ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

      iii.    Recovery of costs;

      iv.    Pre- and post-judgment interest;

      v.    Such other and further relief as the Court deems just and proper;

c.    On the **Third Cause of Action** (False Claims Act; Conspiracy to Commit Violations (31 U.S.C. § 3729(a)(1)(C))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

      i.    Triple the amount of damages sustained by the Government;

      ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

      iii.    Recovery of costs;

      iv.    Pre- and post-judgment interest;

      v.    Such other and further relief as the Court deems just and proper; and

d.    On the **Fourth Cause of Action** (False Claims Act, Retention of Proceeds to Which Not Entitled (31 U.S.C. § 3729(a)(1)(G))) damages as provided by 31 U.S.C. § 3729(a)(1) in the amount of:

      i.    Triple the amount of damages sustained by the Government;

      ii.    Civil penalties of Eleven Thousand Dollars ($11,000.00) for each false claim;

      iii.    Recovery of costs;

      iv.    Pre- and post-judgment interest;

      v.    Such other and further relief as the Court deems just and proper.

1      e.     On the **Fifth, Sixth, Seventh, Eighth, and Ninth** Causes of Action (California

2 Insurance Frauds Prevention Act §§ 1871.7(a) and (b) and California Penal Code §§550(a)(1);

3 550(a)(5); 550(a)(6) and 549) damages as provided by California Insurance Frauds Prevention Act §§

4 1871.7, et seq., in the amount of:

5               i.      Civil penalties of Ten Thousand Dollars ($10,000) for each false and

6                    fraudulent claim submitted, presented or caused to be submitted or

7                    presented to an insurance company;

8               ii.     Assessments of three-times the amount of each claim for compensation

9                    made by Defendants;

10              iii.    Recovery of costs;

11              iv.    Pre- and post-judgment interest;

12              v.     Such other and further relief as the Court deems just and proper.

13     2.     Further, Relator BRYAN BARNETTE, on his own behalf, pursuant to 31 U.S.C.

14 section 3730(d) and California Insurance Frauds Prevention Act §§ 1871.7(g)(1)(A), requests that he

15 receive the maximum amount as permitted by law, of the proceeds resulting from this action or

16 settlement of this action collected by the United States, plus an amount for reasonable expenses

17 incurred, plus Relator's own attorneys' fees and costs of this action. Relator requests that his

18 percentage be based upon the total value recovered from Defendant(s), and each of them, for having

19 made and/or presented false claims and false statements to the United States Government in violation

20 of 31 U.S.C. § 3729(a)(1)(A), including any amounts received from individuals or entities not named

21 as parties to this action.

22     3.     Further, BARNETTE, on his own behalf, as to the **Tenth and Eleventh Causes of**

23 **Action,** requests that, as a result of CARDIO's wrongful and unlawful employment actions against

24 him, that he receive all relief necessary to make him whole, including reinstatement, lost earnings,

25 commissions, merit increases, benefits, back-pay, interest, losses on stock options, damage to

26 reputation and other consequential damages, compensation for any other special damages, civil

27 penalties, double damages, and expenses, attorneys' fees and costs as allowed by law.

28

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

4.     That, as a result of CARDIO's wrongful violation of public policy, BARNETTE receive all relief necessary to make him whole pursuant to federal and state law, including punitive damages.

6.   That Relator, BRYAN BARNETTE, recover such other and further relief as the Court deems just and proper.

Dated: March 2, 2018

**COTCHETT, PITRE & McCARTHY, LLP**

By: _____
NIALL P. McCARTHY
JUSTIN T. BERGER
ADAM M. SHAPIRO

*Attorneys for Relator Bryan Barnette*

## IX.   JURY DEMAND

Relator Bryan Barnette demands a jury trial on all claims so triable.

Dated: March 2, 2018

**COTCHETT, PITRE & McCARTHY, LLP**

By: _____
NIALL P. McCARTHY
JUSTIN T. BERGER
ADAM M. SHAPIRO

*Attorneys for Relator Bryan Barnette*

LAW OFFICES
COTCHETT, PITRE &
McCARTHY, LLP

**AMENDED COMPLAINT**

29