UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, et al.,

Plaintiffs,

v.

CARDIODX, INC., et al.,

Defendants.

Case No. 15-cv-01339-WHO

**ORDER GRANTING MOTIONS TO DISMISS**

Re: Dkt. Nos. 65, 74, 78, 78, 89

Individual defendants David Levison, Deborah Kilpatrick, and Missy Kemp, along with corporate defendant Phlebotek Corporation, each move to dismiss the claims asserted against them in this false claims and wrongful termination suit. For the most part, the allegations against Phlebotek regarding the one scheme stated against it are plausible; insufficient facts are stated concerning Levison's and Kilpatrick's involvement in any scheme; and, Kemp is not liable for the wrongful termination claim stated against her. For the reasons discussed below, Kemp's motion is GRANTED WITH PREJUDICE and the other motions are GRANTED with leave to amend.

## BACKGROUND

Defendant CardioDx, Inc. (Cardio) is a California company with a principal place of business in Redwood City, California. Amended Complaint (Dkt. No. 16, AC) ¶ 9. Plaintiff relator Brian Barnette alleges that defendant Cardio fraudulently sought reimbursement from the federally funded Medicare program for medically unnecessary, excessive, and ineffective cardiovascular tests known as Corus CAD tests. AC ¶ 1. In addition, he asserts that Cardio developed and implemented several schemes to induce medical providers to refer business to it. _Id_. The five schemes alleged against Cardio are:

> (1) fraudulently inducing Palmetto GBA to approve the Corus CAD test for Medicare payment by making false representations of Cardio's "rule out" capability; (2) conspiring with Phlebotek engage in an illegal kickback scheme by providing physicians and medical assistants illegal remuneration for submitting specimens to Cardio; (3) creating an illegal registry kickback scheme that provided physicians illegal remuneration for submitting patient data; (4) organizing unlawful "free screening days" for Medicare patients resulting in claims for medically unnecessary and excessive tests; and

(5) providing unlawful kickbacks by waiving patients' co-pays and deductibles.

Amended Complaint (Dkt. No. 16, AC) ¶ 2.

Defendant Phlebotek is a phlebotomist and medical assistant staffing agency based in Florida that is alleged to have knowingly conspired with Cardio to implement a kickback scheme, causing thousands of false claims to be submitted to Medicare and private insurers in California. *Id*. ¶¶ 2, 10. Defendant Levison is the founder, former CEO, and current Chief Strategy Officer of Cardio and is also on the Cardio Board of Directors. *Id*. ¶ 11. Defendant Kilpatrick is the former Chief Commercial Officer at Cardio and was with the company from 2006 to 2014. *Id*. ¶ 12. Defendant Kemp is the former Director of Sales and current Senior Director of Channel Development at Cardio. *Id*. ¶ 13.

Barnette states that Cardio's principal product is the Corus CAD test, a "genomic expression test" used for patients at risk for coronary artery disease (CAD). *Id*. ¶ 14. The test measures the activity of specific genes in a patient's blood that change when there is a significant narrowing or blockage of arteries. *Id*. Cardio markets the test as a "rule out" test used for CAD patients who present with various symptoms of narrowed or blocked arteries, such as shortness of breath, heartburn, chest tightness, and unexplained fatigue. It promoted use of the test for these individuals to "rule out" the need for additional testing. *Id*. ¶¶ 15, 17. Barnette characterizes the test as an "expensive" one that is billed to Medicare and other payers "upwards of $1,245.00, per test." *Id*. ¶ 15. He contends, however, that only 20% of Medicare covered women have ever been ruled out for further tests by using Corus CAD and that no man over 65 has ever been ruled out. *Id*. ¶ 17.

In Scheme 1, Barnette alleges that these facts regarding the test's inability to rule out Medicare populations were not disclosed to the California Medical Association's former Medical Administrator Contractor (MAC), Palmetto GBA, and that therefore, Palmetto GBA was fraudulently induced to extend Medicare coverage for the Corus CAD test. *Id*. ¶¶ 16, 17, 19-25. He asserts that defendants Levison and Kilpatrick were "heavily involved in this approval process, and played key roles in inducing Palmetto GBA to approve the Corus CAD test." *Id*. ¶ 20. He also states that in 2013, after the Corus CAD test was approved for Medicare coverage, data was

disclosed in an internal meeting (the purpose of which was to discuss ways to increase Cardio's Medicare business) that none of the thousands of Corus CAD tests that had been run had produced "rule out" scores for men over 65 years old, and that the test had only produced rule out scores for less than twenty percent of women over age 65. *Id*. ¶ 21. In response to this and to sales representatives questioning how Cardio received Medicare coverage with those statistics, allegedly Cardio's "Chief Commercial Officer laughed and responded, "We obviously didn't tell them that.'" *Id*.

In Scheme 2, to induce physicians to order the Corus CAD test, Cardio is alleged to have conspired with Phlebotek to enter into "sham phlebotomy contracts with physician offices" where Phlebotek and Cardio sales representatives would sign up medical providers as "independent contractors" of Phlebotek so that they could receive compensation for every Corus CAD test they submitted to Cardio, in addition to their standard wages from the physician or clinic. *Id*. ¶ 25. Barnette contends that this was a "sham" designed to provide remuneration to physicians and their staff in exchange for Corus CAD orders: Phlebotek was paid a $25 draw fee per patient, from which it paid the independent contractors $19 for each test and kept the remaining $6. *Id*. ¶¶ 25-26 (Scheme 2 or Kickback Scheme). The scheme significantly increased Cardio's business; Phlebotek draws accounted for 70% of Cardio's business by 2014. *Id*. ¶ 27. Barnette claims that the tests ordered by physicians as a result of the kickback scheme were neither reasonable nor medically necessary, so that each Medicare claim Cardio submitted to the government was a false claim. *Id*. ¶ 35.

Scheme 3 involved Cardio settling up a "registry" kickback scheme with physicians and clinics, paying physicians up to $250 per patient to participate in patient "registries." *Id*. ¶¶ 36-40. Scheme 4 involved Cardio defrauding Medicare by organizing and hosting unlawful "screening days" marketed to Medicare beneficiaries, resulting in significant and otherwise unexplained increases in the number of tests sales representatives were submitting, often based on only a cursory exam or no exam at all. *Id*. ¶¶ 41-45. In Scheme 5, Cardio is alleged to have provided unlawful kickbacks by waiving copays and deductibles in exchange for referrals by physicians, whereby Cardio would take a loss on a particular test (by not collecting the copay or deductible) in

3

exchange for future, additional referrals. *Id*. ¶¶ 46-50.

Barnette asserts that he was recruited to Cardio to sell Corus CAD tests in 2010, but when he raised his concerns about unethical sales practices and specifically the Schemes identified above to Cardio's management in 2015, he was retaliated against and his employment was terminated. *Id*. ¶¶ 5, 52, 53, 57-60. He contends that he disclosed his concerns that the law had been violated to Kemp and she "retaliated against Relator for internally reporting that information, and based upon the belief that Relator could report that information to legal authorities," terminated Barnette. *Id*. ¶¶ 119-122.

As a relator on behalf of the United States, Barnette alleges in his March 2018 Amended Complaint that Cardio, Phlebotek, Levison, and Kilpatrick violated various provisions of the Federal False Claims Act 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(C) by presenting false claims, making or using false records or statements, and conspiring to do the same. *See* AC (First, Second & Third Causes of Action). He also asserts on behalf of the United States (in the alternative) that these same four defendants violated the Federal False Claims Act 31 U.S.C. § 3729(a)(1)(G) by retaining proceeds to which they were not entitled. *Id*. (Fourth Cause of Action). As a relator on behalf of the State of California, he contends that these four defendants committed insurance fraud by impermissibly procuring patients, receiving kickbacks, and submitting false claims in violation of Cal. Ins. Code §§ 1871.7(a), (b) and Cal. Penal Code §§ 549, 550(a)(1), (a)(5), (a)(6). *Id*. (Fifth, Sixth, Seventh, Eighth & Ninth Causes of Action). On behalf of himself, he states claims for wrongful termination in violation of the False Claims Act and against California public policy against Cardio. *Id*. (Tenth & Eleventh Causes of Action). Also on behalf of himself, Barnette asserts a claim for wrongful termination in violation of California Labor Code section 1102.5 against Cardio and defendant Kemp. *Id*. (Twelfth Cause of Action).

On November 20, 2018, the federal government filed a Notice of Election to Decline Intervention, and the State of California filed a Notice of Non-Intervention on December 4, 2018. Dkt. Nos. 36, 38. Phlebotek, Kilpatrick, Levison, and Kemp now move to dismiss.

All of these defendants argue, first, that the alleged conduct has not been adequately identified and that the "shotgun" allegations in the AC should be dismissed so that Barnette asserts

4

with specificity each defendant's role in the alleged schemes. Phlebotek separately argues that the first, second, and fourth causes of action fail as to it because Barnette does not allege that Phlebotek itself submitted any false claims or certifications to the government and, relatedly, that the allegations as to those claims and the purported conspiracy under the FCA fail to meet the heightened Rule 9(b) standard. Finally, Phlebotek argues that it cannot be held liable under the California Insurance Code and California Penal Code sections underlying the state law claims.

Defendants Kilpatrick and Levison move to dismiss individually but make the same basic arguments – that there are few (in Levison's case only one) allegations as to their separate conduct and knowledge, and those allegations do not satisfy the 9(b) standard. Dkt. Nos. 78, 89. They also argue that the state law claims cannot be asserted against them because they were not "employers" and did not submit false claims personally. Finally, Kemp – who is only alleged to be responsible for Barnette's wrongful termination – moves to dismiss for lack of personal jurisdiction and, alternatively, because she cannot be held personally liable under California Labor Code section 1102.5. Dkt. No. 74.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.* Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

1   fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir.

2   2008).

### DISCUSSION

**I.      PHLEBOTEK MOTION TO DISMISS**

**A.      False Claims Act**

Phlebotek alleges that it cannot be liable under three of the FCA causes of action – the

First (presenting false claims), Second (using false statements), or Fourth (retention of proceeds) –

because there are no allegations that Phlebotek submitted any false claim or certifications to the

government. As detailed above, the only mentions of Phlebotek in the AC are with respect to

Scheme 2 implemented by Cardio, namely the "sham phlebotomy contracts with physician

offices." AC ¶¶ 25-25.

Barnette alleges that Phlebotek's conduct in the scheme violated three specific provisions

of the FAC: first, 31 U.S.C. § 3729(a)(1)(A), when Phlebotek "knowingly presents, or causes to be

presented, a false or fraudulent claim for payment or approval;" second, 31 U.S.C. §

3729(a)(1)(B), when Phlebotek "knowingly makes, uses, or causes to be made or used, a false

record or statement material to a false or fraudulent claim;" and third, 31 U.S.C. § 3729(a)(1)(G),

also known as a "reverse" false claim, when Phlebotek "knowingly makes, uses, or causes to be

made or used, a false record or statement material to an obligation to pay or transmit money or

property to the Government, or knowingly conceals or knowingly and improperly avoids or

decreases an obligation to pay or transmit money or property to the Government." *See* 31 U.S.C.

§ 3729.

Barnette specifically alleges that the kickback scheme into which Phlebotek entered with

Cardio gives rise to the FCA claims under the Patient Protection and Affordable Care Act

("PPACA") 2010 amendments to the Anti-Kickback Statute (AKS), because under 42 U.S.C §

1320a-7b(g) "[i]n addition to the penalties provided for in this section or section 1320a-7a of this

title, a claim that includes items or services resulting from a violation of this section constitutes a

false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31." Under § 1320a-

7b(b)(2)(A), "Whoever knowingly and willfully offers or pays any remuneration (including any

6

kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."

Barnette contends that Phlebotek's contractor arrangement with medical providers – whereby the contractor performing the draw would keep $19 from each blood draw for a Corus CAD test and Phlebotek would keep $6, all paid for by Cardio who would then bill Medicare and insurance providers for the test itself – were kickbacks intended to increase use of the test. AC ¶ 30. These draw fee rates plausibly allege a "kickback" because the Federal Office of Inspector General concluded that payments by a laboratory to referring physicians of $6 per day for "collection of blood samples" likely constituted "prohibited remuneration under the anti-kickback statute." OIG Advisory Opinion No. 05-08, at pp. 1-2; AC ¶ 32. Barnette also alleges that Medicare itself pays only a $3 "draw fee" for collecting physicians. AC ¶ 34.

As to the FCA sections asserted against it, Phlebotek argues it cannot be liable for submitting false claims or false certifications because it never made any claim or certification to the government. It points out that the AC is devoid of any allegations that it submitted false claims or statements to the government or had a duty to pay the government anything. Instead, the AC is replete with allegations that Cardio submitted false claims and false certifications. *See, e.g.*, AC ¶¶ 2, 18, 23.[1]

In response, Barnette asserts that the statutory provisions cover not only the person who actually submits the claim, but also a person who "causes" claims and statements to be presented. Under that language, "the FCA reaches 'any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.' *United States ex rel. Marcus v. Hess*, 317

---

[1] Under the FCA, plaintiff must allege that actual false claims were submitted to the government, not just a scheme to do so. *See, e.g., United States v. v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002). "[T]o commit conduct actionable under the FCA, one must, in some way, falsely assert entitlement to obtain or retain government money or property." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011).

U.S. 537, 544–45 [] (1943) (emphasis added). Thus, a person need not be the one who actually submitted the claim forms in order to be liable." *U.S. v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001). Given the kickback scheme alleged and Phlebotek's necessarily knowing participation in that scheme that directly resulted in Corus CAD tests being submitted to the government by Cardio, Barnette asserts that he has sufficiently alleged the § 3729(a)(1)(A) & (B) claims against Phlebotek.

On the "reverse" false claims, Phlebotek argues that there is no evidence that given its alleged role, it owes any money to the government or otherwise failed to remit anything to the government to be liable under subsection (G). Barnette responds that, as with the other claims, causing someone else to fail to remit something it owes to the government constitutes a reverse false claim. He argues that under the FCA and the Patient Protection and Affordable Care Act ("PPACA"), "Cardiodx had an obligation to repay the Government within 60 days of receipt of payment by the Government for claims Cardiodx submitted that were tainted by Phlebotek's illegal kickbacks. *See* 42 U.S.C. 1320a-7k(d)." Plaintiff's Opposition to Phlebotek MTD (Dkt. No. 75) at 15.[2] Therefore, as Phlebotek caused the illegality in part, it is likewise liable for Cardio's failure to repay the government. Phlebotek points out only that the PPACA obligations relied on by Barnette in his opposition are not actually alleged in the AC. That is true. The reverse FCA claim is DISMISSED with leave to amend so that Barnette can more clearly explain his theory of Phlebotek's liability through Cardio's obligations.

Given the nature of the kickback scheme that Phlebotek played a significant and necessary role in creating and implementing, FCA liability for the substantive violations may be alleged against it because its actions helped cause Cardio's fraudulent Medicare submissions. The reverse FCA claim is DISMISSED with leave to amend.

---

[2] Phlebotek relies on *Lesnik v. Eisenmann SE*, 16-CV-01120-LHK, 2018 WL 4700342, at *9 (N.D. Cal. Oct. 1, 2018) to argue the reverse payment claim should be dismissed. However, in *Lesnik*, the major omission was that the "SAC does not actually allege which Defendant, if any, paid the fees associated" with the false claim, whereas here Barnette identifies that it was Cardio that owed the funds to the government, some of which were funneled to Phlebotek, but that Phlebotek's conduct was key and part of the *cause* for the AKS and FCA violations which obligated the repayment to the government. So both the obligation and Phlebotek's connection with it have been adequately alleged.

### B. Specificity of Allegations

Phlebotek also moves to dismiss the claims against it because Barnette has failed to provide sufficient facts outlining the role Phlebotek allegedly played in the fraudulent Schemes, impermissibly attempting to "lump" the defendants together in violation of Rule 9(b). *See, e.g., U.S. v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (dismissing claims where the "Complaint provides no additional detail as to the nature of the Individual Defendants' involvement in the fraudulent acts, but simply attributes wholesale all of the allegations against Corinthian to the Individual Defendants. Rule 9(b) undoubtedly requires more.").

Under Rule 9(b), plaintiffs must allege more specific facts identifying "the who, what, when, where, and how of the misconduct charged," as well as "what is false or misleading about [the purportedly fraudulent] statement, and why it is false. *See Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks and citations omitted). The allegations of fraud "must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

As noted above, there are specific facts alleged regarding the role of Phlebotek in Scheme 2 implemented by Cardio – the sham phlebotomy contracts with physician offices amounting to illegal kickbacks. Phlebotek argues that they have been improperly "lumped" in with the other defendants and, therefore, could escape liability for the Scheme 2 but somehow be on the hook for liability with respect to the other Schemes. But the AC is specific about Phlebotek's role. The only liability for Phlebotek possible under the AC is liability related to its role in the kickback scheme. Phlebotek is on adequate notice of its alleged conduct as related to the applicable causes of action.[3]

---

[3] Phlebotek complains that in pleading each separate cause of action, Barnette "realleges and incorporates" all prior allegations, but that does not create a "shotgun pleading" problem with respect to Phlebotek whose "outsider" conduct is clearly limited to Scheme 2. *See, e.g.*, *Securities and Exch. Comm. v. Bardman*, 216 F. Supp. 3d 1041, 1051 (N.D. Cal. 2016) ("a complaint does not employ impermissible shotgun pleading just because it re-alleges by reference all of the factual paragraphs preceding the claims for relief."). Barnette indicated at oral argument that in his Second Amended Complaint he would clarify the scope of the liability alleged against Phlebotek.

More narrowly, Phlebotek complains that these claims are still insufficiently alleged under Rule 9(b) because none of its "fifty or so" independent contractor phlebotomists who allegedly enticed the medical providers to join the scheme are identified by name. Nor are the recipients of those enticements identified by name, location, or timeframe. Finally, Phlebotek notes that the timeframe for its alleged role has not been identified, nor has the number of claims for which it is allegedly liable. Without those who, what, where, and when details, it argues, Rule 9(b) has not been met and it cannot determine which of the 120,000 Corus CAD tests that Cardio is alleged to have sold during the relevant timeframe were part of the scheme.

Phlebotek protests too much. It presumably knows how many Corus CAD tests its "independent contractor" phlebotomists drew blood in connection with the scheme because it is alleged to have been paid by Cardio a $25 draw fee per patient, following which Phlebotek paid the independent contractors $19 and kept the remaining $6. AC ¶¶ 25-26. It also presumably knows the identities of its employees who signed up the "independent contractors" and the identities of those "independent contractors" lined up at medical provider offices for purposes of drawing blood for the Corus CAD tests.

As to Phlebotek's role in the conspiracy to pay illegal kickbacks (AC ¶¶ 25 - 35), there are numerous, plausible factual allegations that Phlebotek knowingly conspired with Cardio to violate the FCA through the alleged kickback scheme implemented through the actions of Phlebotek. Given the nature of the allegations of Phlebotek's role in the scheme, it is plausible that every blood draw arranged by a Phlebotek contractor was fraudulent and violated the AKS. Finally, the plausibility of the scheme *being* an illegal kickback scheme is satisfied by Barnette's reliance on evidence that the amount of the draw fee paid by Cardio and kept by both Phlebotek and the local medical providers far exceed the OIG guidance and Medicare's own level of reimbursement for draw fees.

That Barnette does not specifically identify the individuals at Phlebotek who were involved in the scheme or the "contracted" phlebotomists who arranged for the draws at the medical provider offices does not mean that the conspiracy claim has not been adequately alleged under Rule 9(b). Given the nature of the kickback scheme alleged, the central role of Phlebotek

alleged, and the plausible facts, the cases relied on by Phlebotek are inapposite.[4] Barnette has adequately alleged the fraud-based FCA claims against Phlebotek under Rule 9(b).

## C.    State Law Claims

Phlebotek also moves to dismiss the state law claims – asserted in the Fifth through Ninth Causes of Action – arguing that the underlying claims all hinge on a violation of California's Insurance Fraud Protections Act (IFPA, Cal. Ins. Code § 1871.7). It contends that the IFPA is not applicable to this type of case or to the type of misconduct alleged against it.

As relevant here, Section 1871.7(a) provides, "[i]t is unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits pursuant to [Workers Compensation system] or to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." Under Section 1871.7(b), "[e]very person who violates any provision of this section or Section 549, 550, or 551 of the Penal Code" is subject to civil penalties. Penal Code section 550 provides:

> (a) It is unlawful to do any of the following, or to aid, abet, solicit, or conspire with any person to do any of the following:
> (1) Knowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance.
> . . .
> (5) Knowingly prepare, make, or subscribe any writing, with the intent to present or use it, or to allow it to be presented, in support of any false or fraudulent claim.
> (6) Knowingly make or cause to be made any false or fraudulent claim for payment of a health care benefit.
> (7) Knowingly submit a claim for a health care benefit that was not used by, or on behalf of, the claimant.

---

[4] For example, in *U.S. ex rel. Marion v. Heald College, LLC*, 5:12-CV-02067-PSG, 2015 WL 4512843 (N.D. Cal. July 24, 2015, the FCA conspiracy claim was dismissed as to individual, college administrator defendants because there were no facts alleged to support the assertion that those individuals had reached an agreement between themselves, much less with management of the for-profit college, to commit the FCA violations. In that context, the complaint was dismissed for failure to allege any facts about "the time, place or specific language used by the defendants to form their agreement." *Id*. at *4. *See also Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1057 (9th Cir. 2011) (dismissing complaint "which identifies a general sort of fraudulent conduct but specifies no particular circumstances of any discrete fraudulent statement"); *Knudsen v. Sprint Commun*. Co., C13-04476 CRB, 2016 WL 4548924, at *7 (N.D. Cal. Sept. 1, 2016) (dismissing because plaintiff "failed to allege the specifics of such a scheme with plausibility").

United States District Court
Northern District of California

. . .
> (10) For purposes of paragraphs (6) to (9), inclusive, a claim or a claim for payment of a health care benefit also means a claim or claim for payment submitted by or on the behalf of a provider of any workers' compensation health benefits under the Labor Code.
>
> (b) It is unlawful to do, or to knowingly assist or conspire with any person to do, any of the following:
>> (1) Present or cause to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.
>>
>> (2) Prepare or make any written or oral statement that is intended to be presented to any insurer or any insurance claimant in connection with, or in support of or opposition to, any claim or payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any material fact.

Cal. Penal Code § 550.

### 1.    Scope of IFPA

Phlebotek argues, first, that these provisions do not apply to the type of insurance fraud alleged here. It relies on the legislative history of Section 1871.7 that discusses the original adoption of the provision to address workers compensation fraud, and then its amendment in 1994, to address fraudulent automobile insurance claims. Phlebotek MTD (Dkt. No. 75) at 20-21; *see also People ex rel. Allstate Ins. Co. v. Weitzman*, 107 Cal. App. 4th 534, 561-62 (Cal. App. 2d Dist. 2003), *as modified on denial of reh'g* (Apr. 24, 2003) (distinguishing purpose of FCA which is "to recoup government funds lost through the fraud of federal contractors" and purpose of 1871.7 which, at that time, was to "prevent and remedy automobile insurance fraud.").

Barnette, however, notes that the language of the applicable statutory sections expressly encompass claims for "health care benefits" and those claims are not limited to the workers compensation or automobile insurance fraud contexts. He also points out that California courts have applied the IFPA to fraudulent health care claims submitted to private insurers outside the workers compensation or automobile insurance fraud contexts, including one case that involved alleged kickbacks. *See, e.g., State ex rel. Wilson v. Super. Ct.*, 227 Cal. App. 4th 579, 601 (Cal. App. 2d Dist. 2014), *as modified on denial of reh'g* (July 25, 2014) ("Running and capping activities are disfavored and unlawful not just because they may often result in services that are

excessive or unnecessary, but also because their purpose is to unfairly (and perhaps deceptively) obtain the benefits (clients, patients, prescriptions, claims, etc.) that otherwise might have gone to others who did not use the prohibited methods.").[5]

Absent case law to the contrary, I find that the IFPA applies to the kickback conduct alleged against Phlebotek.

### 2. Adequacy of Pleading

Similar to its arguments with respect to the FCA claims, Phlebotek argues that the IFPA claims are not adequately alleged because Barnette had not identified which private insurers received claims for payments (from Cardio), when those claims were submitted, or how the specific requirements of those private insurance contracts were violated. Phlebotek draws distinctions between the pleadings in the *State ex rel. Wilson v. Superior Court* case relied on by Barnette – which had detailed factual allegations regarding the lavish gifts and inducements allegedly provided to medical providers – with the fewer facts alleged here and the small size of the kickback "draw fees."

I disagree. As with the FCA claims, the details of the kickback scheme are adequately alleged and supported by plausible facts. That the individual insurance companies or terms of specific contracts to whom and under which claims were submitted have not been identified does not mean that the claim has not been adequately pleaded. The illegality alleged under section 1871.7(a) turns on the use of a scheme to pay medical providers for providing the Corus CAD tests to patients; it does not turn on the identity or terms of the underlying private insurance contracts. As noted in *State ex rel. Wilson v. Super. Ct.*, it is the employment of others to "procure clients" that violates the law, not the actual submission of specific claims to specific insurers. *Id.*, 227 Cal. App. 4th 579, 593 ("(a) is violated by the employment of others with that objective; it does not make proof of that result a prerequisite to its violation.").

The claim under section 1871.7(b), incorporating Penal Code section 550, does turn on the

---

[5] Barnette also relies on *People ex rel. Govt. Employees Ins. Co. v. Cruz*, 244 Cal. App. 4th 1184 (Cal. App. 4th Dist. 2016) for the proposition that unlawful referral agreements can violate section 1871.7(a), however that case arose in the context of fraudulent insurance claims for medical expenses resulting from automobile accidents.

presenting or causing to be presented a "fraudulent" claim under a contract of insurance. As the case progresses, Barnette will have to show that the "unlawful conduct" was "a substantial factor resulting in the claims." *State ex rel. Wilson v. Super. Ct.*, 227 Cal. App. 4th at 604. But for purposes of pleading, Barnette's allegations that medical providers who ordered and administered the tests received a $19 kickback for each test suffices at this juncture to plead those requirements.

### 3. As Alleged Against Phlebotek

Finally, Phlebotek argues that the IFPA claim against it must be dismissed because the underlying allegations throughout the AC are that the Corus CAD tests were medically unnecessary for the vast majority of recipients, hence the alleged fraud on the private insurers who provided reimbursement for it. It relies on *Maa v. Ostroff*, 12-CV-00200-JCS, 2013 WL 1703377 (N.D. Cal. Apr. 19, 2013), where the court dismissed the FCA claims based on performance of alleged "medically unnecessary" procedures because plaintiff "failed to allege unnecessary procedures with any particularity and only states conclusory assertions," and dismissed the IFPA claims because plaintiff "has not identified any statute that requires claims submitted to private insurers to be medically necessary. Section 550(b) prohibits several types of fraudulent conduct, but says nothing about medically unnecessary procedures. *See* Cal. Penal Code § 550(b)." *Id.* at *21.

Barnette confirms that the IFPA claim against Phlebotek arises not because the Corus CAD test was medically unnecessary (although it allegedly was for the vast majority of recipients) but because the alleged kickbacks were arranged by Cardio through Phlebotek. Barnette points out that those kickbacks violate not only the explicit text of section 1871.7(a) (prohibiting use of runners or other persons to obtain services or benefits under a contract of insurance) but also other statutory provisions. *See, e.g.*, Cal. Bus. & Prof. Code 650(a); Cal. Ins. Code § 750(a).

There is, however, no mention of Business & Professions Code section 650(a) or California Insurance Code section 750(a) in the AC. Barnette shall include these citations in his Second Amended Complaint. Other than that limited required amendment, Phlebotek's motion to dismiss the IFPA claims is DENIED.

14

## II.    KILPATRICK MOTION TO DISMISS

Defendant Kilpatrick moves to dismiss based on the lack of facts alleged about her role in any of the Schemes.  Kilpatrick is mentioned expressly only twice in the AC.  First, she is alleged to be "the former Chief Commercial Officer at CARDIO, and was with the company from 2006 to 2014."  AC ¶ 12.  She is then mentioned in connection with Scheme 1 in that she and defendant Levison "were heavily involved in this approval process, and played key roles in inducing Palmetto GBA to approve the Corus CAD test."  *Id.* ¶ 20.  Her name does not appear again, except as a defendant in each of the first nine causes of action (under the FCA and IFPA).

Kilpatrick argues that the allegations against her  are insufficient to state any of the substantive FCA or IFPA claims under Rule 8, much less under the heightened Rule 9(b) pleading standards.  She also asserts that she cannot be liable for Scheme 1 under the FCA claims, because there is no allegation that she did anything after the Corus CAD test was approved for Medicare coverage by Palmetto GBA and there are no allegations purporting to show that she had knowledge of the falsity of any claims or statements submitted to the government (*e.g.*, that she knew the test was medically unnecessary for those to whom it was being marketed and prescribed).  With respect to the state IFPA claims, she argues that there is no evidence that she engaged in any conduct proscribed by the applicable state laws and there is no liability as an individual (as opposed to an employer) for those claims.

### A.    Adequacy of Allegations as to Kilpatrick

Initially, I agree that the AC does not clearly allege the conduct for which Kilpatrick is allegedly personally responsible.  Unlike Phlebotek, a company separate from Cardio whose role in Scheme 2 was described in detail and whose liability was plausibly supported by the alleged facts, the allegations against Kilpatrick are insufficient.  While Barnette seems to confirm in his Opposition to Kilpatrick's Motion that Kilpatrick's personal liability is connected only to Scheme 1 – by repeatedly referencing paragraphs 19-24 of the AC – that is not clear in the AC.  As a former manager at Cardio, unlike outsider Phlebotek, Kilpatrick's role and liability is potentially broader and she needs to be put on notice of exactly what she is charged with.

Although I rejected Phlebotek's argument that the AC was an impermissible "shotgun"

pleading, Kilpatrick's argument on this point is successful (as is Levison's, as discussed below). *See, e.g.*, *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) (dismissing complaint that grouped multiple defendants together and failed to set out which of the defendants made which of the fraudulent statements/conduct). These individual defendants – who were employed by Cardio – need to be put on notice of what portions of Cardio's conduct they are supposedly liable for and the facts that support those allegations. *See U.S. v. Corinthian Colleges*, 655 F.3d 984, 998 (9th Cir. 2011) (dismissing complaint that "provides no additional detail as to the nature of the Individual Defendants' involvement in the fraudulent acts, but simply attributes wholesale all of the allegations against" the corporate defendant to the individual defendants, because "Rule 9(b) undoubtedly requires more.").

Barnette must amend to explicitly identify the Schemes for which each individual defendant is allegedly liable, and the plausible facts supporting those allegations.

**B.    FCA**

Assuming for purposes of the present motion that Kilpatrick is alleged to be responsible only for Scheme 1, the Scheme 1 allegations are deficient to state the FCA claims against her. The only assertion about her role is that Kilpatrick, along with Levison, was "heavily involved" in the Palmetto GBA approval process in 2012. There are no allegations, for example, that Kilpatrick falsely represented anything to Palmetto GBA at that time (or otherwise how she was involved in preparing the submissions for Medicare approval), nor are there allegations showing that by virtue of her position at Cardio she should have or must have known that the Corus CAD test was not going to "rule out" patients in the way Cardio represented it would. The current allegations are insufficient under Rule 9(b) to allow Kilpatrick to defend against them. *See, e.g.*, *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (the "complete absence of particularity in Bly–Magee's first amended complaint fails to satisfy Rule 9(b).").

In opposition, Barnette points to a statement in the AC that in 2013, in response to questions from sales representatives about data showing the test did not "rule out" in the way it was portrayed and questioning how the test secured Medicare reimbursement, the "Chief Commercial Officer" laughed and explained that "[w]e obviously didn't tell them that." AC ¶ 21.

Barnette claims this statement was not only made by Kilpatrick but creates a plausible inference showing Kilpatrick's knowledge of the falsity of Cardio's representations back in 2012 during the approvals process. That timing is not made clear anywhere in the AC, nor is it clear from other facts alleged that the comment in 2013 was made by Kilpatrick.

Kilpatrick's motion to dismiss the FCA claims is GRANTED, with leave to amend.[6]

## C.    IFPA

Kilpatrick also moves to dismiss the IFPA claims because she cannot be liable under section 1871.7(a) as she did not "employ" anyone (while Cardio did) and she cannot be liable under section 1871.7(b) and Penal Code section 550 because she has not been charged (or investigated) for insurance fraud under the Penal Code.

Kilpatrick's initial argument  is persuasive for two reasons.  First, there are no allegations that she had any role or knowledge of Cardio's schemes involving "employment" of runners or cappers to submit or facilitate false claims.  Second, the use of the word "employ" in subsection (a) could be read to impose a limitation of liability on the *entity* employing the runners and cappers.  None of the parties cite any case law or legislative history in support of or in opposition to the application of this subsection against an *employee* of an entity who has been alleged to have employed persons in violation of the statute. *See State ex rel. Wilson v. Super. Ct.*, 227 Cal. App. 4th 579, 593 (Cal. App. 2d Dist. 2014), *as modified on denial of reh'g* (July 25, 2014) ("The conduct made unlawful by subdivision (a) is identified by a single verb: To employ.  Subdivision (a)'s single verb makes a single act unlawful: Employment. What kind of employment is unlawful? Employment of a person or persons ("runners, cappers, steerers or other persons"), for a specified purpose: "to procure clients or patients to perform or obtain services or benefits ... that will be the basis for" an insurance claim. Subdivision (a) is violated by the employment of others

---

[6] In her motion to dismiss, Kilpatrick relies on information outside of the AC to argue that the data allegedly discussed in 2013 did not in fact change or make false the representations Cardio made in connection with Medicare approval in 2012.  Kilpatrick MTD at 2-3 & n. 2.  However, the studies and articles referenced by Kilpatrick do not fall within the "doctrine of incorporation" as they are not necessarily encompassed by Barnette's AC.  They are not appropriately considered in support of her motion to dismiss.

with that objective; it does not make proof of that result a prerequisite to its violation."); *see also People ex rel. Gov't. Employees Ins. Co. v. Cruz*, 244 Cal. App. 4th 1184, 1198 (Cal. App. 4th Dist. 2016) (finding a triable issue of fact existed about whether a sole defendant violated section 1871.7, subdivision (a) by maintaining an unlawful referral agreement with another doctor). However, at this juncture, given the lack of allegations as to Kilpatrick regarding the employment of or knowledge and intent to employ anyone as functional runners and cappers, the claim is dismissed on that ground with leave to amend.[7]

Kilpatrick's argument regarding subsection (b) and Penal Code section 550 is much weaker. The existence of a criminal investigation or filed criminal charges is not necessary for liability under those statutes. Cases find, or at least discuss, liability under section 1871.7(b) and Penal Code section 550 without evidence or indication of a criminal investigation or charges. *See, e.g., State ex rel. Wilson v. Super. Ct.*, 227 Cal. App. 4th 579; *People ex rel. Allstate Ins. Co. v. Muhyeldin*, 112 Cal. App. 4th 604, 606 (Cal. App. 2d Dist. 2003).

Kilpatrick's motion to dismiss the IFPA claims is GRANTED with leave to amend. Barnette must allege additional facts to support these fraud-based claims, including Kilpatrick's alleged efforts to employ functional runners and cappers and her knowledge and intent regarding the same.

## III.    LEVISON MOTION TO DISMISS

Levison's motion to dismiss rests in large part on the arguments made by Kilpatrick. He was identified in the AC as the founder, former Chief Executive Officer, and current Chief Strategy Officer at Cardio. AC ¶ 11. The only direct allegation against him is that he and defendant Kilpatrick "were heavily involved in" the Palmetto GBA "approval process, and played key roles in inducing Palmetto GBA to approve the Corus CAD test." AC ¶ 20. Those two mentions, Levison argues, are wholly insufficient to meet the standards of either Rule 8 or Rule 9(b).

I dismiss the FCA claims against Levison for the same reasons I dismissed the ones against

---

[7] Kilpatrick also argues, as Phlebotek did, that the IFPA is limited to workers compensation and automobile insurance fraud claims. I rejected that argument above and will not address it further.

Kilpatrick. Barnette must allege facts explaining – and limiting as applicable – Levison's potential liability to specifically identified acts of fraud and the particular Schemes alleged. What did Levison know and do, as opposed to what others may have done? I recognize that the actions of the company may in some instances be plausibly attributed to direction by Levison because of his role as founder, CEO, and Chief Strategy Officer, but the connective tissue joining those allegations and his role or roles at the time of the specific fraudulent acts alleged must be provided. Similarly, although I recognize that Levison's role at CEO may put him on a different footing as one who might have "employed" functional runners and cappers, facts supporting the state law IFPA claims against him are nonetheless missing. Levison's motion to dismiss is GRANTED with leave to amend.

## IV.  KEMP MOTION TO DISMISS

Kemp moves to dismiss for different reasons than Levison and Kilpatrick. She is alleged to have been the former Director of Sales and current Senior Director of Channel Development at Cardio. AC ¶ 13. Her alleged liability is limited to one claim: wrongful termination in violation of California Labor Code section 1102.5. *Id*. ¶¶ 117-123. Barnette alleges that he disclosed to Kemp his concerns that Cardio was violating the law. Kemp then used her authority over both Barnette and his claims of wrongdoing, fearing that Barnette might disclose his concerns to the government, and retaliated against Barnette by terminating his job. AC ¶¶ 119-122. She moves to dismiss for lack of personal jurisdiction, arguing that as a Louisiana resident, she cannot be haled into court in the Northern District, and because she cannot be liable under section 1102.5.

### A.  Personal Jurisdiction

#### 1.  Legal Standard

A nonresident defendant may be sued in a forum if specific jurisdiction exists. *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977).[8] Specific jurisdiction arises when a defendant's specific contacts with the forum give rise to the claim in

---

[8] Barnette does not contend that Kemp is subject to general jurisdiction in California. Therefore, I analyze only whether there is specific jurisdiction over Kemp.

question. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 (1984). "A court exercises specific jurisdiction where the cause of action arises out of or has a substantial connection to the defendant's contacts with the forum."[9] *Glencore Grain Rotterdam BV v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002).

The Ninth Circuit employs a three-part test to determine whether there is specific jurisdiction over a defendant:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. The plaintiff bears the burden of satisfying the first two prongs of the test. *Id.* at 802. If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state. *Id.* If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. *Id.*

The factors to be considered in determining reasonableness include: "(1) the extent of the defendant's purposeful interjection into the forum state, (2) the burden on the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 745 (9th Cir. 2013) (citing *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1087 (9th Cir.2000)).

---

[9] "Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800-801 (9th Cir. 2004).

### 2. Pleadings and Evidence in this Case

Kemp relies on her declaration establishing that she is a lifelong resident of Louisiana who travelled only "occasionally" out of state for work. Declaration of Missy Kemp (Dkt. No. 74) ¶¶ 2-3. She declares that while she worked for California-based Cardio from 2010 through early 2019, she "never worked for CardioDx in California" and never "sold to or targeted California clients or channel partners." *Id.* ¶ 11. Instead, she oversaw regional sales staff and then managers in the East and Southeast. *Id.* ¶¶ 14-19. She admits that she received complaints about Barnette's conduct and sales practices, and referred them to her supervisors, but states that she did not have authority to terminate Barnette. *Id.* ¶¶ 22-26.

Barnette responds that Kemp was one of the few sales managers who had a physical office at Cardio's offices in California and that she travelled to and worked at the California office more than she did from her home. Declaration of Bryan Barnette (Dkt. No. 80) ¶¶ 3, 5. He also alleged that Kemp was, in the weeks before his termination, attempting to dig up dirt on him; he points to emails produced by Cardio that indicate Kemp was an active participant in the investigation into Barnette's alleged wrongdoing prior to his termination and was kept in the loop about his termination and replacement. *Id.* ¶ 7; *see also* Declaration of Justin T. Berger (Dkt. No. 79-1) Exs. 4-6.

Kemp does not respond to or provide any additional details regarding the amount of time she worked at or out of Cardio's California office. Instead, she provides information showing that when Barnette was terminated, she was not in California but was instead on the termination phone call from Louisiana. Kemp Second Declaration (Dkt. No. 84) ¶¶ 2-5. She also relies on a declaration from Meghan Dugan (Dkt. No. 85), the former Associate Director of HR for Cardio, who declares that Kemp was designated as "field based" and not "inhouse" at Cardio, that Kemp travelled to California approximately once a month to work here one or two days on average, and that while Kemp was involved in the investigation into Barnette's conduct that led to his termination Kemp did not have termination authority. *Id.* ¶¶ 13, 14, 16-17.

Given the facts – and assuming that Kemp was "based" outside of California but worked in California once a month for one or two days at a time and was involved in but did not have

termination authority – I still find sufficient connections between her California contacts and the wrongful termination claim to satisfy specific jurisdiction. Kemp was a managerial-level employee availing herself of the opportunity of working for a California company, regularly working in California for part of each month. In addition, she regularly communicated with and reported to her supervisors who were based in California, including on the investigation and termination of Barnette.[10] These uncontested allegations satisfy the first two prongs of the specific jurisdiction test.

Reasonableness is a close call. Defending in California will clearly impose a significant burden on Kemp. But jurisdiction in California is not unreasonable given Kemp's frequent travel to California during the course of her employment with a California-based company and given the interests of a California court in resolving a California-specific cause of action.

## B.   State Law Claim

Despite having personal jurisdiction over Kemp, I agree with Kemp that the California Labor Code section 1102.5 retaliation claim must be dismissed because she is not individually liable.

Barnette argues that the California legislature amended section 1102.5 to expand responsibility under section 1102.5 from "an employer" to "[a]n employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency." Cal. Lab. Code §1102.5(a); *see also id.* (b) "[a]n employer, or any person acting on behalf of the employer,

---

[10] The cases relied on by Kemp are largely inapposite. They discuss situations when an out-of-state employee of an out-of-state defendant has insufficient personal connections with a forum state to confer specific jurisdiction over the individual employee (as opposed to the employer). *See, e.g., Mulato v. Wells Fargo Bank, N.A.*, 76 F. Supp. 3d 929, 943 (N.D. Cal. 2014); *Matsunoki Group, Inc. v. Timberwork Oregon, Inc.*, C 08-04078 CW, 2008 WL 5221077, at *4 (N.D. Cal. Dec. 12, 2008) (the employee-defendant's "mere association with a [non-resident] corporation that allegedly caused injury in California does not make her subject to personal jurisdiction in California."); *Click v. Dorman Long Tech., Ltd.*, C 06-1936 PJH, 2006 WL 2644889, at *3 (N.D. Cal. Sept. 14, 2006) (addressing "whether these acknowledged contacts, which were undertaken by Wade on behalf of his [foreign] employer, are sufficient to support the exercise of specific personal jurisdiction over defendant Wade in his individual capacity."). None of Kemp's cases address the situation here, where the employee-defendant worked exclusively for the forum-based employer-defendant.

shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency.").  But every district court to address the question on a motion to dismiss has concluded that despite the change in language, the statute does not impose personal liability on someone like Kemp, who at all times was acting on behalf of her former employer Cardio.  *See, e.g.*, *Bales v. County of EL Dorado*, 2:18-CV-01714-JAM-DB, 2018 WL 4558235, at *2 (E.D. Cal. Sept. 20, 2018) ("Cases where district courts considered the amended language under the Rule 12(b)(6) standard have found that section 1102.5 does not impose individual liability on supervisors."); *U.S. ex rel. Lupo v. Quality Assurance Services, Inc*., 242 F. Supp. 3d 1020, 1030 (S.D. Cal. 2017) (dismissing individual defendants, concluding that "if the California Supreme Court were ever to consider the issue, it would hold that there can be no individual liability under section 1102.5."); *Tillery v. Lollis*, 1:14-CV-02025-KJM, 2015 WL 4873111, at *10 (E.D. Cal. Aug. 13, 2015) (dismissing individual liability claim, after reviewing language and legislative history because, "[t]he language of the statute on which plaintiff relies does not include clear language imposing individual liability, but rather uses the kind of language consistently associated with imposition of liability on an employer alone."); *see also Browand v. Ericsson Inc*., 18-CV-02380-EMC, 2018 WL 3646445, at *6 (N.D. Cal. Aug. 1, 2018) ("Plaintiff first two claims [] are precluded by law: only employers are liable for tortious wrongful discharge and violations of state law whistleblower protections, not employees or individual supervisors. *See Jacobs v. Universal Development Corp*., 53 Cal. App. 4th. 692, 697 (1997) ("only an employer, and not individual employees, may be liable for tortious discharge"); *Tillery v. Lollis*, No. 1:14-CV-202025-KJM, 2015 WL 4873111, at *10 (E.D. Cal. Aug. 13, 2015) (state whistleblower protections do not create individual liability). These claims do not pass muster under the fraudulent joinder standard; indeed, they were subsequently removed in Plaintiffs' First Amended Complaint.").

Barnette cites no cases that have applied Section 1102.5 to permit individual or supervisory liability.  He points to no legislative history in support of his broader construction. Absent such support, I will follow the weight of the authority.

Kemp's motion to dismiss the one claim asserted against her is GRANTED.  The claim

against Kemp is DISMISSED WITH PREJUDICE.[11]

## CONCLUSION

Phlebotek's motion to dismiss is GRANTED in limited part and with leave to amend. Kilpatrick and Levison's motions to dismiss are GRANTED with leave to amend. Kemp's motion to dismiss is GRANTED WITH PREJUDICE.

Any amended complaint shall be filed within 20 days of the date of this Order.

**IT IS SO ORDERED.**

Dated: May 17, 2019



William H. Orrick
United States District Judge

---

[11] A number of the documents Barnette relies on to oppose Kemp's motion to dismiss for lack of jurisdiction were marked as confidential by Cardio when produced, presumably, to the government during the investigation. Therefore, Barnette filed those documents and the parts of his opposition brief referencing those documents conditionally under seal. Dkt. No. 79. However, no party has submitted a declaration in support of sealing and review of the documents at issue – mostly emails regarding the investigation and termination of Barnette – shows no good cause for their continued sealing. Plaintiff's administrative motion to seal, Dkt. No. 79, is DENIED. The Clerk shall unseal Dkt. Nos. 79-3, 79-4, 79-6.